# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ARCHIE BEATON, individually and on behalf of all others similarly situated, | Case No. 1:13-cv-08389 |
| *Plaintiff*, | Honorable Andrea R. Wood |
| *v.* | |
| SPEEDYPC SOFTWARE, a British Columbia company, | |
| *Defendant*. | |

## MEMORANDUM OF LAW IN SUPPORT OF CLASS CERTIFICATION

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ..................................................................................3

I.     The Development and Marketing of SpeedyPC Pro .................................3

II.    The Free Trial of SpeedyPC Pro ..............................................................5

III.   The Full Version of SpeedyPC Pro ..........................................................6

IV.   Plaintiff Archie Beaton and Hundreds of Thousands of Other Individuals Fell Victim to the Fraudulent Design and Marketing of the Software ...............................7

ARGUMENT ...........................................................................................................9

I.     Both the Proposed Class and Subclass are Sufficiently Numerous ........9

II.    Beaton is Typical of the Class and Subclass .........................................10

III.   Beaton and His Counsel will Adequately Represent the Class ..............12

IV.   The Claims of the Class and Subclass Turn on Answers to Common Questions ......15

       A.    Common questions predominate over the Class's warranty claims ..............16

           i.    The implied warranty of fitness for a particular purpose ......................18

           ii.   The implied warranty of merchantability................................20

       B.    Common questions predominate over the Subclass's claims........................21

V.     A Class Action is a Superior Way to Proceed Here ..............................24

VI.   Both the Proposed Class and Subclass are Ascertainable ....................26

CONCLUSION ......................................................................................................26

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT**

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 350 (2011) ........................................................9, 15, 20

**UNITED STATES CIRCUIT COURTS OF APPEALS**

*Bell v. PNC Bank, N.A.*, 800 F.3d 360 (7th Cir. 2015) .................................................15

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004).................................................25

*CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011).......................13

*Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570 (7th Cir. 2001) ..............22

*Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331 (11th Cir. 2015)............................23

*McCaster v. Darden Restaurants, Inc.*,
    __ F.3d __, 2017 WL 56298 (7th Cir. Jan. 5, 2017) ........................................................26

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802  (7th Cir. 2012) ................................16

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015)............................................9, 20, 26

*Muro v. Target Corp.*, 580 F.3d 485 (7th Cir. 2009) ...................................................10

*Rikos v. Proctor & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015).....................................24

*Spano v. The Boeing Co.*, 633 F.3d 574 (7th Cir. 2011).................................................10

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014)................................................15, 20

*Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010) ...................................24

**UNITED STATES DISTRICT COURTS**

*Aliano v. Louisville Distilling Co, LLC*, 115 F. Supp. 3d 921 (N.D. Ill. 2015)...........................22

*Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551 (N.D. Ill. 2015) ............................9, 10, 26

*Boyd v. Avanquest N. Am.*, Dkt. 208, No. 12-cv-4391 (N.D. Cal. Jan 29, 2016) ........................14

*Cobb v. Monarch Fin. Co.*, 913 F. Supp. 1164 (N.D. Ill. 1995)....................................................17

*Forcellati v. Hyland's, Inc.*, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014)....................................23

ii

*Greifenstein v. Estee Lauder Corp.*, 2013 WL 3874073 (N.D. Ill. July 26, 2013)........................22

*Gross v. Symantec Corp.*, Dkt. 89, No. 12-cv-154 (N.D. Cal. Mar. 21, 2014)........................ 14-15

*Hall v. Tuneup Corp.*, Dkt. 87, No. 13 C 1804 (N.D. Ill. Dec. 16, 2014) ....................................14

*Hawkins v. Securitas Sec. Servs. USA, Inc.*,
    2011 WL 5598365 (N.D. Ill. Nov. 16, 2011) ....................................................................13

*In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015)..........................................22, 23

*Jackson v. Nat'l Action Fin. Servs., Inc.*, 227 F.R.D. 284 (N.D. Ill. 2005) .................................12

*Johnson v. Yahoo! Inc.*, 2016 WL 25711 (N.D. Ill. Jan. 4, 2016) ..........................................10, 15

*Kulesa v. PC Cleaner, Inc.*, Dkt. 101, No. 12-cv-725 (C.D. Cal. Aug. 26, 2014)........................14

*Lagarde v. Support.com, Inc.*, Dkt. 61, No. 12-cv-609 (N.D. Cal. May 30, 2013) .....................15

*LaSalle Bank, N.A. v. Paramount Props.*, 588 F. Supp. 2d 840 (N.D. Ill. 2008) .........................16

*Maxwell v. Arrow Fin. Servs., LLC*,
    No. 03-cv-1995, 2004 WL 719278 (N.D. Ill. Mar. 31, 2004) ...........................................14

*Medline Indus. Inc. v. Maersk Medical Ltd.*, 230 F. Supp. 2d 857 (N.D. Ill. 2002)....................16

*Nieberding v. Barette Outdoor Living, Inc.*, 302 F.R.D. 600 (D. Kan. 2014) ..............................21

*Olson v. Brown*, 284 F.R.D. 398 (N.D. Ind. 2012) .......................................................................13

*Peterson v. H&R Block Tax Servs., Inc.*, 174 F.R.D. 78 (N.D. Ill. 1997) .......................................3

*Rawson v. Source Receivables Mgmt., LLC*, 289 F.R.D. 267 (N.D. Ill. 2013)..............................25

*Rottner v. AVG Techs. CZ SRO*, Dkt. 116, No. 12-cv-10920 (D. Mass. May 5, 2014)................14

*Streeter v. Sheriff of Cook County*, 256 F.R.D. 609 (N.D. Ill. 2009)....................................12, 13

*Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239 (S.D. Ill. 2015)..................................................23

*Yencha v. ZeoBIT LLC*, Dkt. 55, No. 14-cv-578 (W.D. Pa. Nov. 5, 2015) ..................................14

*Ziemack v. Centel Corp.*, 163 F.R.D. 530 (N.D. Ill. 1995)...........................................................11

**STATE COURTS**

*Aliano v. Ferris*, 988 N.E.2d 168 (Ill. App. Ct. 2013) ................................................................22

*Aspinall v. Philip Morris Cos. Inc.*, 813 N.E.2d 476 (Mass. 2004) .............................................24

*Bergman v. Spruce Peak Realty LLC*, 847 F. Supp. 2d 653 (D. Vt. 2012) ..................................24

*Boatel Indus., Inc. v. Hester*, 550 A.2d 389 (Md. Ct. App. 1988) ...............................................11

*Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584 (Ill. 1996) ............................................21, 22

*Davis v. Powertel Inc.*, 776 So.2d 971 (Fla. 1st DCA 2000) .......................................................23

*Dix v Am. Bankers Life Assur. Co. of Fla.*, 415 N.W.2d 206 (Mich. 1987) ................................24

*Fayne v. Vincent*, 301 S.W.3d 162 (Tenn. 2009) ........................................................................24

*In re McFadden*, 18 B.R. 758 (Bankr. E.D. Ark. 1982) ..............................................................12

*Keenan v. Cherry & Webb*, 131 A. 309 (R.I. 1925) ...............................................................18-19

*Martin v. Wells Fargo Bank*, 91 Cal. App. 4th 489 (3d Dist. 2001) ...........................................12

*Rhino Linings USA Inc. v. Rocky Mountain Rhino Lining, Inc.*,
    62 P.3d 142 (Colo. 2002) ......................................................................................................23

*Saucier v. Countrywide Home Loans*, 64 A.3d 428 (D.C. 2013) ................................................24

*Suarez v. E. Int'l College*, 50 A.3d 75 (N.J. Ct. App. 2012) ......................................................24

**FOREIGN COURTS**

*Amiri v. Gen. Motors of Canada & Morrey Sales*, 2010 BCPC 282 ............................................11

*Gee v. White Spot Ltd.*, 1986 CanLII 776 (BC SC) ...............................................................16, 18

*Grant v. Australian Knitting Mills, Ltd.*, [1936] A.C. 85 ...........................................................19

*Koblet Mfg. Co. Ltd. v. Pac. Rim Engineered Prods.*, 2011 BCSC 224 ...............................20-21

*Marshall v. Ryan Motors Ltd.*, 1922 CanLII 142 (SK CA) ........................................................19

*Priest v. Last*, [1903] 2 K.B. 148 ...............................................................................................18

*Savoie v. Rene's Service & Trailer Sales Ltd.*, 2007 NBQB 229 ...............................................21

*Trencon Distribs. v. Domar S.A.*, 1992 CanLII 181 (BC CA)......................................................20

*Villeseche (c.o.b. Green Apples Graphics) v. Total N. Comm., Ltd.*,
    [1997] Y.J. No. 51 (C.A.) .................................................................................................21

*Wharton v. Tom Harris Chevrolet Oldsmobile Cadillac Ltd.*, 2002 BCCA 78............................20

*Whitney-Morton Co. v. Short*, 67 D.L.R. 573 (BC CA 1922) .....................................................16

*Woodpecker Hardwood Floors (1987) Ltd. v. Wishinski*, 1999 BCPC 42 ...................................17

## STATUTES

815 ILCS 505...............................................................................................................................21

D.C. Code § 28:2-316.01 .............................................................................................................11

Md. Code, Comm. Law § 2-316.1 ...............................................................................................11

Md. Code, Comm. Law § 9-102 ..................................................................................................11

RSBC 1996, ch. 410, § 18 .....................................................................................................17, 18

RSBC 1996, ch. 410, § 20 .....................................................................................................11, 17

RSBC 1996, ch. 410, § 56 ...........................................................................................................20

## MISCELLANEOUS

Fed. R. Civ. P. 23 ............................................................................................................... *passim*

Fed. R. Evid. 609 .........................................................................................................................14

Samuel Williston, *The Law of Sales in the Proposed Uniform Commercial Code*,
    63 HARV. L. REV. 562 (1950) ...........................................................................................17

## INTRODUCTION

Defendant SpeedyPC Software ("SpeedyPC"), a Canadian software company, sells SpeedyPC Pro (the "Software"), a product that it warranted would "optimize[] memory," "eliminate clutter, error messages, freezing, crashes or erratic performance," "manage[] your computer's resources for improved performance," and "protect [you] and your PC by removing malware and privacy files." It turns out none of that was true. The reality is that SpeedyPC Pro was never going to deliver on any of those promises because it simply wasn't programmed to do so. Instead, as SpeedyPC's Senior Director of Technical Operation's testified on behalf of SpeedyPC, the Software was designed to blindly report that a PC has low performance or critical health without analyzing the impact of any "problems" detected. In that respect, the Software delivered big for SpeedyPC: defrauding literally hundreds of thousands of U.S. consumers out of tens of millions of dollars.

Beaton now moves to certify a class (the "Class") consisting of "all individuals living in the United States who downloaded a free trial of SpeedyPC Pro and thereafter purchased the full version between October 28, 2011 and November 21, 2014."[1] He seeks to litigate on behalf of the Class contractual warranty claims for breaches of the implied warranties of fitness for a particular purpose and merchantability. Because these claims derive from the End User License Agreement ("EULA"), they are governed for all Class members by British Columbia law, and each can be resolved on the basis of evidence common to the Class.

---

[1]     Excluded from the Class and later defined Subclass are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entity's current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family, (3) persons who execute and file a timely request for exclusion from the Class, (4) persons who have had their claims in this matter finally adjudicated and/or otherwise released, and (5) the legal representatives, successors, and assigns of any such excluded person.

For the fitness claim, common evidence will show that Class members purchased SpeedyPC Pro for a particular purpose: to identify and fix problems that are slowing down their computers. That is the only purpose for which SpeedyPC held out the Software and indeed its marketing campaign targeted individuals who sought help for precisely that purpose. And because during the class period SpeedyPC used the same standardized marketing materials and SpeedyPC Pro's functionality and interface remained unchanged, common evidence will demonstrate that SpeedyPC Pro was not fit for the particular purpose for which it was bought or sold. Moreover, the damages inquiry will require an assessment of the value of SpeedyPC Pro, so this aspect of relief also can be resolved on a classwide basis.

The merchantability claim runs along nearly identical lines. Under British Columbia law, a good is merchantable if it is fit for the purpose that goods of that type are normally sold. Common evidence will again demonstrate the purposes for which goods like the Software are generally offered for sale, and, like the fitness claim, will show it was unfit for those purposes. Any damages questions are the same for both a merchantability claim and a fitness claim.

The Court should also certify as a subclass *or* in the alternative "all Class members who reside in Illinois, California, Colorado, Florida, New York, Oregon, Alabama, Tennessee, New Jersey, North Carolina, New Hampshire, Hawaii, Vermont, Massachusetts, Michigan, and Washington, D.C." (the "Subclass"). Determining SpeedyPC's liability under the consumer-protection laws of these jurisdictions requires assessing, on an objective basis, whether SpeedyPC's misrepresentations were deceptive and material. Since its marketing remained consistent during the class period, this inquiry, too, can be resolved for everyone in a single stroke. And given the similarity between the claims for relief under the laws of these various states, the Subclass is functionally all governed by the same legal rules.

The drafters of Fed. R. Civ. P. 23 observed that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action." Fed. R. Civ. P. 23 Advisory Committee Notes to Rule 23(b)(3)—1966 Amendment. That is the situation here. "The claims in this case are premised on written misrepresentations contained in standard[ized] documents furnished to every class member—a situation that presents a classic case for treatment as a class action." *Peterson v. H&R Block Tax Servs., Inc.*, 174 F.R.D. 78, 83 (N.D. Ill. 1997) (quotations omitted). Accordingly, Beaton respectfully requests that the Court certify the Class and Subclass under Fed. R. Civ. P. 23, appoint him as class representative for the Class and Subclass, and appoint his lawyers as class counsel under Fed. R. Civ. P. 23(g).

## FACTUAL BACKGROUND

### I. The Development and Marketing of SpeedyPC Pro.

SpeedyPC Pro was first released on October 28, 2011. (*See* June 16, 2016 Deposition Transcript of Barry Dodd ("Dodd June Tr.") at 11:6-9, attached as Exhibit 2.) The Software was developed on an "ad hoc" basis, without any kind of formal plan. (*See* June 17, 2016 Deposition Transcript of Patrick Couchman ("Couchman Tr.") at 103:3-11, attached as Exhibit 3.) To determine what functionality it should have (or at least advertise), Defendant did a competitive analysis to see what other competitors purported to offer. (Dodd June Tr. 13:5-19.)

Once the software was developed, SpeedyPC looked to its marketing team—which consisted of designers and copywriters who had no technical background and developed the advertising essentially in isolation from the software developers—to make it as profitable as possible. (*See* Dodd June Tr. at 14:10-13; 20:22-25; 22:9-15.) They performed keyword searches on Google Tools to determine what keywords got the most hits, and then created the marketing, graphics, and representations based on their findings. (*Id.* at 15:21-17:5.) Once they were done,

3

the marketing materials were approved by another set of individuals who did not have any technical background. (*See* Dodd June Tr. at 22:9-15.)

The focus for the marketers was on creating materials that would place SpeedyPC Pro among the top results for Internet searches related to slow computers, crashes, errors, malware, and viruses. (Dodd June Tr. 18:2-9, 19:3-12; 19:18-20; 20:10-11.) SpeedyPC devised marketing representations so that anyone looking for solutions to their computer problems using Google's Internet search engine would find SpeedyPC Pro. (*Id.* at 20:22-25, 24:17-20.) The result was a comprehensive campaign that advertised the Software as capable of "Fix[ing] Common Errors," "Boost[ing] PC Speed," "Clean[ing] Up Clutter," and "Fix[ing] All" problems. (SPEEDY 000016, attached as Exhibit 4.) It promised the "free scan [would] take a comprehensive look at your PC and do a performance check," (SPEEDY 000020, attached as Exhibit 5), and that SpeedyPC Pro was "The Premium Solution" because it "has a complete suite of cleaning, repair and optimization tools" that "addresses the various areas that can cause errors and drastically diminish PC performance." (*Id.*)

SpeedyPC's marketing team created marketing materials both for its own use and for use by its resellers. (Dodd June Tr. 51:9-14.) Any minor changes made by a reseller would have remained variations on a very consistent theme, because SpeedyPC had the authority to, and did, end relationships with affiliates who advertised in an inconsistent manner. (Dodd June Tr. 56:22-57:9.) Between its release in 2011 and November 21, 2014, there were no appreciable differences in how the Software was advertised and how it functioned, despite modifications to the source code. (*See* Expert Witness Report of Craig Snead Prepared Pursuant to Fed. R. Civ. P. 26(a)(2)(B) ("Snead Rep.") at ¶ 6, attached as Exhibit 6; Couchman Tr. 46:2-14.)

## II.     The Free Trial of SpeedyPC Pro.

Once a consumer came across SpeedyPC Pro, they had the option of downloading a free trial before purchasing it. (Dodd June Tr. 25:18–26:1.) But rather than provide some of SpeedyPC Pro's services and show individuals how the full version would actually work, the free trial was yet another in a series of misrepresentations about SpeedyPC Pro's capabilities. All that a free trial would do was, supposedly, assess their computer's health and see if they needed to purchase SpeedyPC Pro. (*Id.*)

Ostensibly, SpeedyPC Pro would "assess" a computer's health within five modules: System Protection, Malware, Performance Problems, Privacy Items, and Junk Files. (SPEEDY 0000425, attached as Exhibit 7.) For each module, SpeedyPC Pro purported to tell the user whether the "damage" was "Good," "Minor," "Serious," or "Critical." (*Id.*) But none of those terms are defined in any meaningful way by SpeedyPC Pro or correlate to any sort of industry standard. (Couchman Tr. 67:11-13.) And Defendant did not program SpeedyPC Pro to actually assess the health of any computer. (*See e.g., id.* at 43:10-44:11 (stating the Software "doesn't" know whether a problem or error will "have an impact on the performance of a computer.").)[2] According to Defendant's expert, having SpeedyPC Pro assess the health of a computer is not a "realistic standard. I could say I want Microsoft Word to cook dinner for me, but that doesn't mean it's a reasonable standard for the software package." (Dec. 21, 2016 Deposition Transcript of Monty Myers ("Myers Tr.") 170:24–176:4, attached as Exhibit 8.)

---

[2]     Defendant's Senior Director of Technical Operations further explained that he was "not particularly familiar with the process" of how something gets flagged as an unwanted process (Couchman Tr. 71:12-19), did not know there was a security gauge under the performance gauge (*id.* at 97:6-15), did not know why the performance gauge said "min" prior to the start of a scan (*id.* at 27:19-20) because it "has no view of the status of a computer," then (*id.* at 28:1-5), and "wasn't privy to the rationale behind [the] number" that determined whether a computer had a critical or good performance level (*id.* at 67:3-10).

In addition to identifying "damage" levels, the free-trial version of the scan also made alarming representations to users in the forms of dials, gauges, colors and warnings. (*See* Snead Rep. ¶ 8, Fig. 1.) When an individual first downloaded the free-trial version, they were immediately confronted with "Warning!" in a red banner—which SpeedyPC's CEO said he believed was to get consumers' attention. (*See* May 17, 2016, Transcript of Barry Dodd ("Dodd May Tr.") at 41:10-23, true and accurate excerpts of which are attached as Exhibit 9.) But at that point no analysis had actually been performed on the computer. (Couchman Tr. 27:5–28:5.)

Once the Software actually scanned the computers, it gave another "Warning!" with the number of "problems" identified, alarming graphics and colors, and a promise that by clicking "Fix All" the Software would "take care of these [problems] now!" (Snead Rep. ¶ 8, Fig. 1.) ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ (*Id.* at. ¶ 10.) There was no actual analysis, however, to determine if the "Performance" level was *actually* low or if the computer was in "Critical" condition. (*See id.* at ¶¶ 26, 31, 35, 41, 45-46; Couchman Tr. 43:10-44:11.) To "Fix" the problems "identified," however, consumers had to pay for the full version. (Snead Rep. ¶ 8.)

## III.    The Full Version of SpeedyPC Pro.

If a user opted to "Fix" his or her computer using SpeedyPC Pro, they were primarily directed to one of two payment processors affiliated with SpeedyPC: Safecart (which processes approximately 95% of payments) or Avangate. (*See* Dodd May Tr. at 24:8-18; 39:9-13.) Regardless of what website an individual first visited to learn about the Software or what company processed their payments, SpeedyPC has access to records of every individual who

6

purchased SpeedyPC Pro, including their names, email addresses, and credit card information. (*See* SPEEDY 000001, attached as Exhibit 10; Dodd June Tr. 60:11-14; 62:21-25.) During the class period, SpeedyPC Pro has been available for purchase for between $9.97 and $39.97. (SP AMENDED 003627, attached as Exhibit 11; SP AMENDED 000671, attached as Exhibit 12.)

Whether SpeedyPC Pro credibly scans computers for and then "fixes" problems is the dispute at the heart of the lawsuit. For present purposes, it is enough to say that this is a dispute that turns on common evidence. Based on Plaintiff's expert's review of the source code, the

███████████████████████████████████████████████████████

███████ (Snead Rep. ¶ 7.) In particular, it was designed to look for certain files and count the overall number or collective size identified. (Couchman Tr. 37:1, 49:2-20.) SpeedyPC Pro didn't detect whether the files were actually harmful or had any negative effect on the computer; instead the software was an arbitrary counting mechanism, a pure numbers game. (*Id.* at 44:4-11, 49:10-20.) In fact, the Software didn't even consider the model and speed of the central processing unit, the hard drive used, the amount of RAM installed and available, or the amount of available disk space when determining the "Performance" level of the computer or its "Damage" rating—information that is undoubtedly relevant to the performance and health of an individual computer. (*See* Snead Rep. at ¶ 12.)[3]

## IV. Plaintiff Archie Beaton and Hundreds of Thousands of Other Individuals Fell Victim to the Fraudulent Design and Marketing of the Software.

In light of the clear promises about how the Software could perform contained in SpeedyPC's online marketing materials and made within the free trial's interface, hundreds of

---

[3]     SpeedyPC Pro's interface was changed on November 21, 2014, after the security company Symantec began warning its users that SpeedyPC was a type of malware called a "potentially unwanted program," also known as a "PUP." (Dodd June Tr. at 41:23-42:5.) The user interface was drastically modified: there were no longer any dials, damage level demarcations, warning banners, or mention of "errors." (*Id.* at 39:6-11, 41:6-17.)

thousands of people purchased SpeedyPC Pro in an effort to enhance the performance of their computers. Plaintiff Beaton was one such individual. (SPEEDY 000001.) Like everyone he seeks to represent, Beaton downloaded the free trial in hopes of optimizing his computer's performance. (July 28, 2016 Transcript of Deposition of Archie Beaton ("Beaton Dep. Tr."), at 49:18-20, true and accurate portions of which are attached as Exhibit 13.) He downloaded the unlicensed version, ran the free scan, and upon reviewing the results, chose to purchase the Software to "Fix All" of the identified problems. (*Id.* at 69:1-10.)

Rather than improve his computer, SpeedyPC Pro actually made it worse. (*Id.* at 49:18-20.) In fact, according to SpeedyPC's expert, the types of problems afflicting Plaintiff's computer could not be fixed by SpeedyPC Pro, but Defendant never disclosed that fact. (*See* Myers Tr. 124:1-128:14) (stating that SpeedyPC Pro can't fix hardware problems, amongst other things, and that requiring such functionality "would be like saying Microsoft Word doesn't automatically correct my spelling as good as I'd like it to . . . no product does everything, and -- and so it does what it does . . . that's just the way the software industry works.") Feeling misled into purchasing the Software and frustrated by his experience, Beaton brought this suit. His complaint identified a number of possible bases for recovery, but two are relevant here: his contract-based theory and his claim under the Illinois Consumer Fraud Act ("ICFA"). (Dkt. 1, ¶¶ 58-69, 81-90.) The contract theory forms the basis for the broader Class's claims: Under this theory, Beaton alleges that SpeedyPC Pro failed to live up to Defendant's assertions about the Software's capability, and seeks to recover the difference between the value of the Software as advertised, and the value of the Software actually delivered. (Dkt. 1, ¶¶ 84-85, 90.) This is a classic breach of warranty claim, both in terms of the theory of liability and the theory of damages. Beaton's consumer-fraud theory, the basis for the claims of the Subclass, alleges that

the marketing materials developed and disseminated by SpeedyPC were objectively deceptive because they would mislead a reasonable consumer given that, Beaton alleges, the Software's actual functionality is nothing like what is represented in its marketing. (Dkt. 1, ¶¶ 61-66.)

## ARGUMENT

To merit certification, all proposed classes must meet the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a). Because Beaton seeks to recover money damages on behalf of the Class and Subclass, he seeks certification under Rule 23(b)(3). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 350, 362 (2011). He must therefore demonstrate that the proposed classes meet Rule 23(b)(3)'s requirements of predominance and superiority. A Rule 23(b)(3) class also must be ascertainable, that is, defined by objective criteria. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). As explained below, Beaton's proposed Class and Subclass meet all the prerequisites for class certification in Rules 23(a) and (b)(3), and should be certified.

## I.      Both the Proposed Class and Subclass are Sufficiently Numerous.

A class action may only proceed when the proposed class is so numerous as to render joinder impractical. Fed. R. Civ. P. 23(a)(1). As few as 40 members can render joinder impractical. *See, e.g.*, *Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015) (finding a proposed class of 120 members to be sufficiently numerous). The proposed Class and Subclass easily clear this minimal hurdle. Defendant's records reflect that in the United States there were more than 570,000 individuals who downloaded a free trial of SpeedyPC Pro before purchasing the full version (Jun. 26, 2016 Email from J. Borcia to C. Booth, attached as Exhibit 14), so the proposed Class plainly meets the numerosity requirement. Regarding the Subclass, the states included in the subclass comprise 48% of the United States population, so it can be

9

assumed, for present purposes, that the Subclass consists of around 275,000 of those individuals. *See Barnes*, 310 F.R.D. at 557 ("the court may make common sense assumptions to determine numerosity"). Numerosity is thus satisfied.

## II.   Beaton is Typical of the Class and Subclass.

A putative class representative also must demonstrate that his claims are typical of the claims of the class he seeks to represent. Fed. R. Civ. P. 23(a)(3). There can be little doubt that Beaton's claims are typical of the Class's claims. A plaintiff's claims are typical of the proposed class when there is "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). A named plaintiff's claim may be atypical if it is subject to a unique defense, and so would fail on grounds not generally applicable to the class and doom potentially meritorious claims, or if the plaintiff might prevail on a ground that is inapplicable to the class at large. *Johnson v. Yahoo! Inc.*, 2016 WL 25711, at *3 (N.D. Ill. Jan. 4, 2016). Neither concern is present here.

First, Beaton's claims "arise[] from the same . . . course of conduct that gives rise to the claims of other [C]lass members and [are] based on the same legal theor[ies]." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009). Each Class member was exposed to materially identical representations made about SpeedyPC Pro's functionality and capability. Beaton's claims, like the claims of the Class, proceed on the theory that these representations are actionable, either indirectly under a contractual warranty theory or directly as a deceptive or unfair practice. For Beaton and the Class, this requires proof about the Software's capabilities and the representations made by Defendant and, for the consumer-protection claims of the Subclass, fact finding based on the same evidence about whether the misrepresentations were

objectively deceptive and material. For these reasons, and as explored further below, Beaton's claims "stand or fall on the same facts as the claims of the putative [C]lass members." *Ziemack v. Centel Corp.*, 163 F.R.D. 530, 534 (N.D. Ill. 1995). He is therefore typical of the Class.

Beaton expects that Defendant will attack his typicality on the ground that he used his computer, and by extension SpeedyPC Pro, for business uses, and so his purchase isn't governed by British Columbia's Sale of Goods Act. Such an argument would fail. The Act provides that it does not apply to sales of goods "to a purchaser or lessee who intends to use the goods primarily for business purposes." RSBC 1996, ch. 410 § 20(1)(B). "The onus is on [Defendant] to establish that the statutory protection provided to consumers by way of the Sale of Goods Act is not available to [Beaton]." *Amiri v. Gen. Motors of Canada & Morrey Sales*, 2010 BCPC 282, ¶ 29. It cannot do so.

Case law from British Columbia sheds little light on what is meant by § 20(1)(B)'s exception, but the language of the Act tracks the UCC and amendments to it in a handful of American jurisdictions. *See, e.g.*, Md. Code, Comm. Law § 2-316.1 (establishing that merchants cannot disclaim implied warranties in sales of consumer goods); § 9-102 (defining "consumer goods" as those "used . . . primarily for personal, family, or household purposes"); D.C. Code § 28:2-316.01; *see also infra* at IV.a (discussing similarities between BC's Sale of Goods Act and American warranty law).

Authorities applying these laws make clear that Beaton is covered by the Act. Ordinarily "it is the primary use, or the most significant use, to which the product is put which should be considered as determinative." *Boatel Indus., Inc. v. Hester*, 550 A.2d 389, 398 (Md. Ct. App. 1988). The evidence makes clear that Beaton's primary use for his computer was personal. (Declaration of Archie J. Beaton, attached as Exhibit 15.) Thus, even though Beaton may have

used his laptop for business purposes, it remains primarily a personal-use good. *See, e.g.*, *Martin v. Wells Fargo Bank*, 91 Cal. App. 4th 489, 495 (3d Dist. 2001) (holding, under similar statute regulating consumer credit transactions, that an "extension of credit" could be "primarily for personal, family, or household purposes" even if some uses of credit were business-related); *In re McFadden*, 18 B.R. 758, 761 (Bankr. E.D. Ark. 1982) (concluding a camcorder was a "consumer good" because "the average weekly hour spent on personal use exceeded the average per week spent on use for business purposes"). Any challenge to typicality would therefore fail.

**III.    Beaton and His Counsel will Adequately Represent the Class.**

The Court should also find that Beaton is an adequate class representative. *See* Fed. R. Civ. P. 23(a)(4). In assessing adequacy, this Court must determine whether Beaton has: (1) antagonistic or conflicting claims with other members of the Class; (2) a sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) counsel who is competent, qualified, experienced, and able to vigorously conduct the litigation. *Streeter v. Sheriff of Cook County*, 256 F.R.D. 609, 613 (N.D. Ill. 2009) (quotations omitted). All three requirements are met here. As explained above, Beaton's claims are the same as the claims of the Class. He also has a sufficient interest to ensure vigorous advocacy: the recovery of the money he paid to purchase SpeedyPC Pro. *See Jackson v. Nat'l Action Fin. Servs., Inc.*, 227 F.R.D. 284, 289 n.6 (N.D. Ill. 2005) ("[Plaintiff] has a sufficient interest in the outcome of his suit—namely, the recovery of damages—to ensure vigorous advocacy."). Finally, Beaton has vigorously engaged in the litigation of this action for three years. In addition to reviewing documents and responding to discovery, Plaintiff sat for a deposition on two occasions, and has otherwise assisted proposed class counsel in the prosecution of the case. (*See* dkts. 108, 111.) There can be no question that he is adequate.

SpeedyPC's recent filings, however, suggest that it will dredge up Beaton's nearly 40-year-old conviction to contest his adequacy. (See Dkt. 114, at 2.) If raised, that argument fails. A felony conviction is not a *per se* bar to serving as a class representative. *See Streeter*, 256 F.R.D. at 613; *see also Olson v. Brown*, 284 F.R.D. 398, 413 (N.D. Ind. 2012) (rejecting argument that "Mr. Olson's unrelated criminal history disqualifies him as an adequate representative" because "Mr. Olson's credibility is being questioned on the basis of an almost eight year old conviction obtained pursuant to a plea agreement which has no substantive relation to this case"). A criminal history can be relevant if the crime involves dishonesty or untrustworthiness, traits that may bear on adequacy. *See Olson*, 284 F.R.D. at 413 ("personal characteristics, such as the credibility and integrity of a putative class representative, have a direct bearing on the ability to adequately represent absent members of the class"). But "[f]or an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 728 (7th Cir. 2011).

Defendant cannot meet this standard. The evidence shows that Beaton is credible. He is a contributing member of his community and a successful entrepreneur. (Beaton Dep. Tr. 19:24-22:14, 60:1-10.) In fact, Canada itself has recognized Beaton's character, as the Canadian government has provided him with a Letter of Rehabilitation that allows him to travel to Canada and even to work there if he chooses. (*See* Ex. 15-A.) Moreover, Beaton's conviction is so stale at this point that it is inadmissible as evidence of his character. *See* Fed. R. Evid. 609(b); *see also Hawkins v. Securitas Sec. Servs. USA, Inc.*, 2011 WL 5598365, at *5 (N.D. Ill. Nov. 16, 2011) (rejecting argument that evidence of previous bad acts rendered class representative inadequate

because the "alleged dishonesties and bad acts are likely inadmissible"). In sum, the evidence suggests Beaton is a credible witness, advocate, and class representative.

Beaton's lawyers also are adequate to represent the Class and should be appointed class counsel pursuant to Rule 23(g), as they are ready and willing to "zealously represent and advocate on behalf of the class as a whole." *Maxwell v. Arrow Fin. Servs., LLC*, No. 03-cv-1995, 2004 WL 719278, at *5 (N.D. Ill. Mar. 31, 2004). Under Rule 23(g), factors such as the work class counsel have done in identifying or investigating potential claims, their experience handling other class actions, their knowledge of the law, and the resources they will commit to the case are all indicative of adequacy. Fed. R. Civ. P. 23(g).

Here, Plaintiff's counsel have spent years heavily litigating this action. They have briefed (and prevailed on) two complex motions and engaged in extensive discovery on behalf of Beaton and the Class, including traveling to British Columbia on three occasions for depositions and engaging in expert discovery regarding class certification. In terms of experience, proposed class counsel are experienced members of the plaintiffs' bar and have litigated myriad consumer-protection class actions, including a series of cases involving many of the same issues against utility software providers that are present here—one of which was before this Court. *See Boyd v. Avanquest N. Am.*, Dkt. 208, No. 12-cv-4391 (N.D. Cal. Jan 29, 2016) (finally approving settlement of claims against software company for misrepresenting software's capability, finding Edelson PC had adequately represented the class); *Yencha v. ZeoBIT LLC*, Dkt. 55, No. 14-cv-578 (W.D. Pa. Nov. 5, 2015) (same); *Hall v. Tuneup Corp.*, Dkt. 87, No. 13 C 1804 (N.D. Ill. Dec. 16, 2014) (same; before this Court); *Kulesa v. PC Cleaner, Inc.*, Dkt. 101, No. 12-cv-725 (C.D. Cal. Aug. 26, 2014) (same); *Rottner v. AVG Techs. CZ SRO*, Dkt. 116, No. 12-cv-10920 (D. Mass. May 5, 2014) (same); *Gross v. Symantec Corp.*, Dkt. 89, No. 12-cv-154 (N.D. Cal.

Mar. 21, 2014) (same); *Lagarde v. Support.com, Inc.*, Dkt. 61, No. 12-cv-609 (N.D. Cal. May 30, 2013) (same). Beaton's lawyers are thus well versed in the kinds of issues presented and have experience in this type of setting. (*See also* Firm Resume of Edelson PC, attached as Exhibit A to the Declaration of Benjamin H. Richman.) They have "demonstrated their competence through their submissions and also through their prosecution of this case to date," *Johnson*, 2016 WL 25711, at *6 (citations omitted), and should be appointed pursuant to Fed. R. Civ. P. 23(g).

## IV.     The Claims of the Class and Subclass Turn on Answers to Common Questions.

Rule 23(a)(2) instructs that a class may be certified only if there exist "questions of law or fact common to the class." In class actions seeking relief in the form of damages, like this one, those common questions must "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The question of commonality and predominance overlap in ways that make them difficult to analyze separately." *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 374 (7th Cir. 2015). A common question is one that is "capable of class-wide resolution" such "that determining the truth or falsity of the common contention will resolve an issue that is central to the validity of each claim." *Id.* (citing *Wal-Mart*, 564 U.S. at 350). "What matters to class certification ... [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal–Mart*, 564 U.S. at 350 (quotation marks omitted). "[T]he critical point is the need for *conduct* common to members of the class." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (quotation marks omitted). When "the defendant's allegedly injurious conduct differs from plaintiff to plaintiff . . . no common answers are likely to be found." *Id.* But when "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members," class treatment is likely to be appropriate. *Id.*

There is no doubt that Defendant at all times acted consistently towards the Class and

Subclass, and this common conduct gives rise to "the same kind of claims" for both. Given this

inquiry, assessment of commonality and predominance begins with the elements of the

underlying claims for relief. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815

(7th Cir. 2012). Beaton pursues two claims on a classwide basis: his contractual warranty claim

(for the Class) and his claim under the ICFA (for the Subclass). Common questions abound here

and predominate over any individual inquiries that may exist. Class treatment is thus appropriate.

### A. Common questions predominate over the Class's warranty claims.

To start, the warranty claim. This Court previously expressed hesitation about whether

the law of Class members' home-states or the law of British Columbia would apply to the

contractual claims. (Dkt. 77.) Given the wording of the EULA, the Court tentatively reasoned

that the choice-of-law clause governs only claims that arise directly out of the contract's terms.

That reading is sound. *See LaSalle Bank, N.A. v. Paramount Props.*, 588 F. Supp. 2d 840, 849-50

(N.D. Ill. 2008) (concluding that, under Illinois principles, a choice-of-law clause governing

"This Note" would apply only to contract claims or claims that "are dependent upon the

contract"); *Medline Indus. Inc. v. Maersk Medical Ltd.*, 230 F. Supp. 2d 857, 862-63 (N.D. Ill.

2002) (concluding that clause providing "[t]his agreement shall be subject to English law"

applied only to contract claims or claims "dependent upon the agreement").[4]

---

[4]     As the Court previously noted, this Court is perfectly capable of applying British
Columbia law. Indeed, British Columbia's warranty law resembles, in many key respects,
American warranty law as reflected in the Uniform Commercial Code. This is no doubt because
those two bodies of law are branches springing from the same root: the English Sale of Goods
Act of 1893. British Columbia's Sale of Goods Act (like the materially identical Sales of Goods
Acts in every common-law province) is patterned after the English Statute of the same name. *See
Gee v. White Spot Ltd.*, 1986 CanLII 776 (BC SC), ¶ 4; *Whitney-Morton Co. v. Short*, 67 D.L.R.
573, 576-77 (BC CA 1922) (opinion of McPhillips, J.). The English Sale of Goods Act also was

Beaton's warranty claims arise out of the contract with Defendant. Much like America's Uniform Commercial Code, British Columbia's Sale of Goods Act, Rev. Stat. B.C. 1996, ch. 410, inserts into every contract for the sale of goods the implied warranties of fitness for a particular purpose and merchantability. *Id.* § 18(a), (b). These warranties provide the basis for the Class's claims, and each is amenable to classwide adjudication. *See Cobb v. Monarch Fin. Co.*, 913 F. Supp. 1164, 1171 (N.D. Ill. 1995) ("claims arising out of form contracts are particularly appropriate for class action treatment").

Before reaching the warranties, it is apparent that two threshold questions can be answered on a classwide basis. First, can the Class members even take advantage of the implied warranties? Defendant purports to disclaim them in the EULA. (SPEEDY 000034-000035, attached as Exhibit 16; SPEEDY 000039, attached as Exhibit 17.) But can they do so? British Columbia law suggests no: The Sale of Goods Act specifically renders void any contractual term that purports to waive those warranties. RSBC 1996, ch. 410, § 20(2); *Woodpecker Hardwood Floors (1987) Ltd. v. Wishinski*, 1999 BCPC 42, ¶ 20.[5] Either way, the answer is the same for all Class members.

Second, does the Sale of Goods Act apply here? Defendant clearly thinks so, as it has attempted to disclaim all express and implied warranties that normally come with the sale of a good. (SPEEDY 000034-000035, 000039.) Beaton was unable to locate any case holding that software is a "good" within the meaning of B.C.'s Sale of Goods Act, but the weight of precedent from the Canadian, American, British, and Australian legal systems suggests that

---

the precursor to the ALI's Uniform Sales Act, which itself beget the UCC. *See* Samuel Williston, *The Law of Sales in the Proposed Uniform Commercial Code*, 63 Harv. L. Rev. 562, 563 (1950).

[5]     All Canadian decisions cited in this memorandum, as well as many more, can be found by searching at www.canlii.org/en, which is publicly available Westlaw for Canadian law. (For the Court's convenience, copies of cited foreign decisions also are attached to this memorandum at Exhibit 18.)

downloadable computer software is a good.[6] Again, though, because every Class member purchased the same type of product—downloadable mass-produced software—the answer to this question is identical for everyone.

### i.    The implied warranty of fitness for a particular purpose.

Although this case involves both types of implied warranties, the analysis for each is largely the same. Consider first the implied warranty of fitness for a particular purpose. Under the Sale of Goods Act, "if the buyer or lessee, expressly or by implication, makes known to the seller or lessor the particular purpose for which the goods are required, so as to show that the buyer or lessee relies on the seller's or lessor's skill or judgment, and the goods are of a description that it is in the course of the seller's or lessor's business to supply, whether the seller or lessor is the manufacturer or not, there is an implied condition that the goods are reasonably fit for that purpose." RSBC 1996, Ch. 410, § 18(a). This claim thus requires Beaton and the proposed Class to prove (1) that they, expressly or by implication, made known the purpose for which they needed SpeedyPC Pro, (2) that SpeedyPC Pro was unfit for that purpose, and (3) that they were thereby harmed. Each element is capable of classwide resolution.

The ability of a plaintiff to prove his or her required purpose by implication permits common evidence on this question to show classwide liability. English courts, construing the same provision in the English Sale of Goods Act, long ago adopted the common-sense rule that when a product is held out for sale for a particular purpose, a buyer who purchases that product impliedly conveys that he or she requires it for that purpose. *See Priest v. Last*, [1903] 2 K.B. 148. That same principle was thereafter recognized in the United States, *see Keenan v. Cherry &*

---

[6]    Canadian courts regularly rely on authority from other common law legal systems. *See Gee*, 1986 CanLII 776, ¶ 3 ("Although counsel were unable to find any authority binding on this court in support of that submission, cases decided in other provinces and the United Kingdom and the United States support an affirmative answer.").

*Webb*, 131 A. 309, 311 (R.I. 1925) ("Knowledge of the buyer's particular purpose may be shown from the sale alone."), Australia, *see Grant v. Australian Knitting Mills, Ltd.*, [1936] A.C. 85, 99 ("there is no need to specify in terms the particular purpose for which the buyer requires the goods . . . because it is the only purpose for which any one would ordinarily want the goods"), and Canada, *see Marshall v. Ryan Motors Ltd.*, 1922 CanLII 142, ¶ 26 (SK CA) ("where an article which is prima facie applicable to one purpose only is sold by its ordinary recognized description, then, inasmuch as there is a sale for a particular purpose which is understood by both the buyer and the seller, the fact that the buyer does not make known to the seller the particular purpose for which the article is required, otherwise than by the ordinary description of the article, does not exclude the contract of sale from the operation of" the Sale of Goods Act).

Here, common evidence shows that Defendant held SpeedyPC Pro out for a particular purpose: to "Improve [Their] PC's Performance" by identifying and repairing errors and problems. (Exhibit 4.) Common evidence also shows that SpeedyPC Pro was not designed to perform in that manner—in fact, it was likely never even tested to determine whether it improved computer speed before its release.[7] And, common evidence will show that instead of identifying and repairing errors, the Software was designed to identify arbitrary files as "problems" and assign corresponding arbitrary "damage" levels to those "problems." (*See, e.g.,* Snead Rep. at ¶¶ 26, 31, 35, 41, 45-46; Couchman Tr. 43:10-44:11; Myers Tr. 170:24–176:4.)

Finally, under the Sale of Goods Act, damages are measured by "the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if

---

[7]     In self-serving testimony, Couchman claimed, for the first time, that the person who developed the software gave him an "understanding" that "empirical testing" was conducted in China before release. (Couchman Tr. 50:20–54:9.) However, he only had "an understanding rather than information" about this testing, (*id.* at 54:1), and SpeedyPC did not produce any evidence in response to document requests on this topic.

they had answered to the warranty." RSBC 1996, ch. 410, § 56(3). Because all Class members purchased nearly identical Software (Snead Rep. at ¶ 6, Couchman Tr. 46:6-14) that was designed to function in the same way on every computer regardless of a given computer's specifications, (Myers Tr. 233:25–238:25) (stating Myers and his team did not "observe any significant or material obvious differences in problems" after testing on numerous computers of various specifications), the value of SpeedyPC Pro will be identical for everyone. Thus, almost every issue that is "central to the validity" of the Class's claims can be resolved in "one stroke." *Wal-Mart*, 564 U.S. at 350.

Because Class members paid varying amounts for SpeedyPC Pro, calculating damages will be an individual endeavor. But "the need for individual damages determinations at this later stage of the litigation does not itself justify the denial of certification." *Mullins*, 795 F.3d at 671. "[I]t is routine in class actions to have a final phase in which individualized proof must be submitted." *Suchanek*, 764 F.3d at 756. All that this final phase would require in this case is individual verification of purchase price.

### ii. The implied warranty of merchantability.

Analysis of Beaton's merchantability claim runs along similar lines. *See, e.g.*, *Wharton v. Tom HarrisChevrolet Oldsmobile Cadillac Ltd.*, 2002 BCCA 78, ¶ 33 ("in many cases there may be no practical difference between the two warranties"); *Trencon Distribs. v. Domar S.A.*, 1992 CanLII 181, at 3 (BC CA) ("I tend to the view that fitness and quality are different characteristics though the same defect might make the unit both unfit and unmerchantable."). In B.C., "[m]erchantable quality means the goods must be of such quality, in such state or condition as it is reasonable to expect, and fit for the purpose for which it is normally purchased within the market in which it is sold.'" *Koblet Mfg. Co. Ltd. v. Pac. Rim Engineered Prods.*, 2011 BCSC

224, ¶ 57 (citing *Savoie v. Rene's Service & Trailer Sales Ltd.*, 2007 NBQB 229, ¶¶ 15-16)).
"'Unmerchantable' has been frequently taken to mean 'unsaleable' but in other circumstances
has been taken to mean 'defective' or 'useless'." *Villeseche (c.o.b. Green Apples Graphics) v.
Total N. Comm., Ltd.*, [1997] Y.J. No. 51 (C.A.), ¶ 8 (concluding that computer equipment and
software that were sold together and could not start automatically were unmerchantable). A
claim for breach of the implied warranty of merchantability thus requires Beaton and the Class to
prove (1) that SpeedyPC Pro is normally purchased for a particular reason, (2) that it was not fit
for that purpose, and (3) damages. Again, each element is susceptible of common proof.

First, common evidence will demonstrate the market within which SpeedyPC Pro existed,
and the purposes for which goods sold in that market were typically purchased. *See Nieberding
v. Barette Outdoor Living, Inc.*, 302 F.R.D. 600, 611 (D. Kan. 2014) (observing that common
evidence will necessarily be used to prove this element of a merchantability claim). Second,
because each version of SpeedyPC Pro sold during the class period is nearly identical, common
evidence will show that SpeedyPC Pro was unfit for those purposes. (Snead Rep. at ¶ 6,
Couchman Tr. 46:6-14) Third, the damages inquiry here is identical to the inquiry under the
fitness claim, and for the same reason turns in part on common evidence. *See supra* at IV.A.i.

**B.   Common questions predominate over the Subclass's claims.**

Beaton also raises a claim under the Illinois Consumer Fraud Act, 815 ILCS 505. To
prevail on this claim, Beaton must show (1) a deceptive act or practice by SpeedyPC, (2)
SpeedyPC's intent that purchasers rely on the deception, (3) that the deception occurred in a
course of conduct involving trade and commerce, and (4) that its deception proximately caused
the purchaser's loss. *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 593 (Ill. 1996). The
requirement that the deceptive act be in trade or commerce is uncontestable, as are the elements

that SpeedyPC intended for consumers to rely on their misrepresentations (it did specific Google Tool searches to identify the most commonly searched combinations of words and used those terms to increase sales (Dodd June Tr. at 15:21-17:5)), and of loss. Thus, the Court can quickly proceed to the remaining elements.

To demonstrate that SpeedyPC Pro's advertising was deceptive, Beaton must show that it creates a likelihood of confusion or has the capacity to deceive. *See Aliano v. Ferris*, 988 N.E.2d 168, 176 (Ill. App. Ct. 2013). As then-Judge Wood has recognized, "this is the kind of language courts use when they are describing an objective inquiry." *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 579 (7th Cir. 2001) (Wood, J., concurring). Regarding proximate causation, neither Beaton nor anyone in the Subclass need demonstrate that they relied on the misrepresentations. *See Connick*, 675 N.E.2d at 593; *Cozzi Iron*, 250 F.3d at 576. Instead, proximate causation is synonymous with deception and may be inferred when there are no events that break the causal chain between the misrepresentation and the purchase. *See, e.g.*, *Aliano v. Louisville Distilling Co, LLC*, 115 F. Supp. 3d 921, 932 (N.D. Ill. 2015); *Greifenstein v. Estee Lauder Corp.*, 2013 WL 3874073, at *2-*3 (N.D. Ill. July 26, 2013). And, "in cases like this one where the representation being challenged was made to all putative class members, Illinois courts have concluded that causation is susceptible of class wide proof and that individualized inquiries concerning causation do not predominate if plaintiffs are able to adduce sufficient evidence that the representation was material." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 997-98 (C.D. Cal. 2015) (collecting cases). Beaton's ICFA claim presents two questions: (1) Are SpeedyPC's misrepresentations likely to deceive a reasonable consumer?; and (2) are they material?

The answers to these questions also establish Defendant's liability under the consumer protection laws of the rest of the states represented in the Subclass. *ConAgra*, a case about

misleading advertising, exhaustively details the relevant analysis for many of these states. California's Unfair Competition Law, False Advertising Law, and Consumers Legal Remedies Act, which "[f]or purposes of class certification . . . are materially indistinguishable," *Forcellati v. Hyland's, Inc.*, 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014), "allow[] plaintiffs to establish materiality and reliance (i.e., causation and injury) by showing that a reasonable person would have considered the defendant's representation[s] material." *ConAgra*, 90 F. Supp. 3d at 983. Under Colorado's Consumer Protection Act, "a classwide inference of reliance and causation" is permissible if "there is evidence that the [misrepresentation] was material to the putative class." *Id.* at 988 (citing *Rhino Linings USA Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 148 n.11 (Colo. 2002)). Florida follows the same pattern: Under Florida's Deceptive and Unfair Trade Practices Act, "the question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances." *Davis v. Powertel Inc.*, 776 So.2d 971, 974 (Fla. 1st DCA 2000), cited in *ConAgra*, 90 F. Supp. 3d at 992. And on and on. As *ConAgra* details, the same questions must be answered to determine Defendant's liability under the laws of New York, *id.* at 1008, Ohio, *id.* at 1011-12, and Oregon, *id.* at 1012-13.

In another case involving misleading advertising in the Southern District of Illinois, Judge Rosenstengel certified a class including purchasers from Alabama, Tennessee, and New Jersey, in addition to some states already mentioned (including Illinois). *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 252 (S.D. Ill. 2015). It is easy to see that these states can be lumped in with those already mentioned. *See Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1334 (11th Cir. 2015) (noting that the Alabama Deceptive Trade Practices Act creates a private right of action for a consumer against a seller who violates the statute, including by

"misrepresenting the characteristics or qualities of goods and representing that goods are of a particular standard or quality when they are not"); *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009) (finding under the Tennessee Consumer Protection Act that "[a] deceptive act or practice is, in essence, a material representation, practice or omission likely to mislead reasonable consumers to their detriment.") (quotations omitted); *Suarez v. E. Int'l College*, 50 A.3d 75, 88 (N.J. Ct. App. 2012) ("the [Consumer Fraud Act] may be violated by an affirmative misrepresentation so misleading as to a fact material to the consumer's decision that the consumer is effectively deprived of the ability to make an intelligent decision").

Another mislabeling decision, *Rikos v. Proctor & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015), demonstrates that these common questions also determine liability under the laws of North Carolina, *id.* at 518, and New Hampshire, *id.* at 516. And the answers to the common questions laid out above will further determine Defendant's liability under the laws of Hawaii, *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1092-93 (9th Cir. 2010), Vermont, *Bergman v. Spruce Peak Realty LLC*, 847 F. Supp. 2d 653, 671 (D. Vt. 2012), Massachusetts, *Aspinall v. Philip Morris Cos. Inc.*, 813 N.E.2d 476, 486 (Mass. 2004), Michigan, *Dix v Am. Bankers Life Assur. Co. of Fla.*, 415 N.W.2d 206, 209 (Mich. 1987), and D.C., *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 441-43 (D.C. 2013).

Because the same questions must be answered with respect to Defendant's conduct in order for any member of the Subclass to prevail, the Court should conclude that the Subclass meets Rule 23(a)'s requirement of commonality and Rule 23(b)'s requirement of predominance.

**V.    A Class Action is a Superior Way to Proceed Here.**

A class action is the superior method for adjudicating the claims in this case. *See* Fed. R. Civ. P. 23(b)(3). Defendant sold SpeedyPC Pro for between $9.95 and $39.97 (Exhibits 11-12),

meaning each Class member stands to recover, an amount far too small to justify individual

litigation. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The

*realistic* alternative to a class action is not 17 million individual suits, but zero individual suits,

as only a lunatic or a fanatic sued for $30."); Fed. R. Civ. P. 23(b)(3)(A) (noting that a court may

consider the class members' interest in individual litigation under the rubric of superiority). As

other courts have recognized, aggregating such small-stakes claims is a principal use of the class

device: "if class actions can be said to have a main point, it is to allow the aggregation of many

small claims that would otherwise not be worth bringing, and thus to help deter lawless

defendants from committing piecemeal highway robbery, a nickel here and a nickel there, that

adds up to real money, but which would not be worth the while of an individual plaintiff to sue

on." *Rawson v. Source Receivables Mgmt., LLC*, 289 F.R.D. 267, 270 (N.D. Ill. 2013) (citation

omitted). Aggregation also produces judicial efficiency, conserving judicial resources while

ensuring that neither party must tolerate inconsistent verdicts. *See id.* For this reason, it is

desirable to concentrate this litigation in a single forum. *See* Fed. R. Civ. P. 23(b)(3)(C).

Beaton's proposed class action also is manageable. As explored in detail above, the

claims of the broader Class will proceed under a single body of decisional law: the law of British

Columbia. *See supra* at IV.A. And while the claims of the Subclass are not technically identical,

the Subclass is structured so that each member is governed by the same legal rules and share the

same need to prove the objectively deceptive nature of Defendant's misrepresentations in order

to establish its liability. Moreover, the claims process will be trivially easy in this case. Because

Defendant has access to the names, addresses, and amount each Class member paid for the

Software, determining who has a valid claim and for what amount will require only checking a

claim against a list compiled from its exhaustive records. Thus, "'the likely difficulties in

managing a class action' in this case are minimal given the predominance of common issues, the readily available identity of all class members, and the relative ease of administering the claims process." *Barnes*, 310 F.R.D. at 562 (quoting Fed. R. Civ. P. 23(b)(3)(D)). Accordingly, a class action is the superior method of adjudicating these claims.

**VI.     Both the Proposed Class and Subclass are Ascertainable.**

Finally and although not an express requirement of Rule 23, it is an implicit requirement that the certified class be ascertainable. *See Mullins*, 795 F.3d at 659. To be "ascertainable," the class need only be defined by objective criteria and not defined in terms of success on the merits. *Id.* The proposed Class and Subclass here meet these requirements. Each are defined by objective criteria: Purchase of SpeedyPC Pro and geographic location. No element of any applicable claim for relief is incorporated into the Class definition, so neither the Class nor Subclass is impermissibly fail-safe. *See McCaster v. Darden Restaurants, Inc.*, __ F.3d __, 2017 WL 56298, at *4 (7th Cir. Jan. 5, 2017). And, to the extent the Court has any concerns about administrative feasibility, it bears noting that Defendant has access to records containing the names, billing, contact, and sale information for every Class member (*see* Dodd June Tr. 62:21-25), thus compiling a class list is a simple matter here. (*See also* SPEEDY 27929–27942, attached as Exhibit 19) (showing complex queries of databases dating back to 2011).)

Accordingly, the proposed Class and Subclass are ascertainable.

## CONCLUSION

SpeedyPC Pro does not work as advertised. A single merits proceeding will demonstrate that rather than purchasing a useful tool to improve their computer's performance, all members of the Class were duped into parting with their money in exchange for a computer program that's value was far less than promised. Beaton's claims arising out of his purchase of SpeedyPC Pro

merit class treatment, and the Court should certify the Class and Subclass of individuals situated similarly to Beaton outlined above.

Respectfully submitted,

**ARCHIE BEATON**, individually and on behalf of all others similarly situated,

Dated: January 27, 2017      By: /s/ Benjamin H. Richman

                                One of Plaintiff's Attorneys

Benjamin H. Richman
brichman@edelson.com
Courtney C. Booth
cbooth@edelson.com
Amir C. Missaghi
amissaghi@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin H. Richman, an attorney, hereby certify that on January 27, 2017, I caused to be served the above and foregoing ***Memorandum of Law in Support of Class Certification*** by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the court's CM/ECF electronic filing system.

/s/ Benjamin H. Richman        