**Monty G. Myers - 12/21/2016**

```
            IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION


ARCHIE BEATON,              )
individually and on         )
behalf of all others        )
similarly situated,         )
                            )
          Plaintiff,        )
                            )  Case No. 1:13-cv-08389
VS.                         )
                            )
SPEEDYPC SOFTWARE, a        )
British Columbia            )
company,                    )
                            )
          Defendant.        )




             ORAL AND VIDEOTAPED DEPOSITION OF
                     MONTY G. MYERS
                   December 21, 2016
```

    ORAL AND VIDEOTAPED DEPOSITION OF MONTY G. MYERS,
produced as a witness at the instance of the Plaintiff
and duly sworn, was taken in the above-styled and
-numbered cause on December 21, 2016, from 9:01 a.m. to
5:28 p.m., before KELLY E. FISHER, CSR, in and for the
State of Texas, reported by machine shorthand, at the
offices of Regus, 100 Congress Avenue, Suite 2000,
Austin, Texas 78701 pursuant to Rule 45 of the Federal
Rules of Civil Procedure and the provisions stated on
the record herein.

bb57c8a0-3786-4f7e-917c-c665ceeebdda

Monty G. Myers - 12/21/2016

```
 1                        APPEARANCES

 2
    FOR THE PLAINTIFF:
 3       Mr. Amir C. Missaghi
         Ms. Courtney C. Booth
 4       EDELSON PC
         350 North LaSalle Street
 5       Suite 1300
         Chicago, Illinois  60654
 6       Phone: 312-589-6370
         Fax: 312-589-6378
 7       amissaghi@edelson.com
         cbooth@edelson.com
 8
 9  FOR THE DEFENDANT:
         Mr. James K. Borcia
10       TRESSLER LLP
         223 South Wacker Drive
11       Suite 2200
         Chicago, Illinois  60606
12       Phone: 312-627-4104
         Fax: 312-627-1717
13       jborcia@tresslerllp.com
14
    Also Present:
15       Mr. Jason Lemley, videographer

16

17

18

19

20

21

22

23

24

25
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty G. Myers - 12/21/2016**

```
 1    information.
 2         Q.   (BY MR. MISSAGHI)  The -- the -- the last
 3    sentence there, you say, "While, like I have indicated
 4    in this report, a forensic expert might like to be able
 5    to examine the laptop in question to understand its
 6    condition and status," forensing -- "forensic testing
 7    and other analysis would not be done directly on such
 8    laptop."
 9              Did you examine the laptop in this case?
10         A.   I did not.
11         Q.   Would you have liked to examine the laptop?
12         A.   Once we had the forensic image, I thought
13    that -- and we had snapshots of -- of the actual advice,
14    the commercial device.  I think that was what we needed.
15    That -- that's exactly the point here, is that we
16    have -- you know, we don't want to look at the actual
17    computer.  We want to look at the image so it
18    preserves -- if we have to, if an issue comes up, we can
19    certainly go back to the computer; and there might be
20    something that would come up where that would be
21    relevant.
22         Q.   I -- I guess in your report you -- you bring up
23    the ATI graphics card issue.
24         A.   Yes.
25         Q.   And the DNS issue related to a network card,
```

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty G. Myers - 12/21/2016**

```
 1    possibly.
 2                    THE REPORTER:  A what?
 3         Q.  (BY MR. MISSAGHI)  A network card, possibly.
 4    Is -- is that the case?
 5         A.  I bring up two issues.  I wouldn't say that the
 6    DNS issue is related to a network card.
 7         Q.  That's fair.
 8                    Were there any other hardware issues that
 9    may -- that you think may have contributed to any
10    problems the plaintiff may have been suffering from?
11         A.  Those were two that we noticed in the logs on
12    the computer.  And again, these are logs that -- that --
13    where these errors came up immediately after being
14    reformatted and reinstalling the operating system.
15                    So these are -- there were other errors.  I
16    have not, so far, endeavored to go look at those.  I
17    might if -- if -- if -- you know, depending on where the
18    case goes.  I mean, you know, we found a couple of what
19    we thought were material in our scan and -- and
20    identified those.  There are others in those logs that
21    we haven't fully analyzed.
22                    THE REPORTER:  Are we on 3?
23                    MR. MISSAGHI:  I think we're on 3, yep.
24                    (Myers Exhibit No. 3 was marked.)
25         Q.  (BY MR. MISSAGHI)  I'm handing you what's been
```

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

1   marked as Exhibit No. 3.  Do you recognize this

2   document?

3        A.  (Examines document.)  Yes.

4        Q.  What do you recognize this document to be?

5        A.  My general recollection is that this was the

6   part -- the parties -- I was asking for information and

7   wanted certain information to do my independent

8   analysis, and there was discussion on how that would

9   take place, and there was -- you know, I -- I vaguely

10  remember being asked about my opinion on how that should

11  take place.  I can't recall if I did that specifically

12  here.  But this is -- this is, I guess, a mutually

13  agreed process for reviewing the plaintiff's computer.

14       Q.  Did you ever make a request to inspect

15  Plaintiff's laptop?

16       A.  My best recollection is, is that was all you

17  wanted to offer -- when I say "you," your side -- at

18  first.  And -- and for the reasons stated in the

19  footnote we just read, that, you know, in liability, you

20  know, generally speaking, I don't want to go in somebody

21  else's place and start mucking around with their

22  computer.  I wanted to take an image and do it that way.

23           So while it had been offered to me, maybe

24  was -- a lot of prior understandings, I might have done

25  that.  But, you know, this was, I think, an agreement

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

 1   made to where an image would be made and we could do

 2   our -- our work in a professional way without having to

 3   do that.

 4            Yeah.  Again, that's not to say -- we would

 5   start with the image.  If there were issues where we

 6   needed -- you know, we learned something in the image

 7   that would need to go further and look at the computer,

 8   you know, to do more than we could, it's there and we

 9   could work that protocol out.  But -- but this -- this

10   was setting up the ground rules for that process.

11        Q.  All right.  Section B, we're just running --

12   running through this thing.

13        A.  Are you talking about my report?

14        Q.  Of your report.  Paragraph 38.

15        A.  All right.

16        Q.  In that -- in that first sentence there, you

17   identify a software genre.

18        A.  Yes.

19        Q.  What do you mean by a software genre?

20        A.  I mean a type of product that -- there are --

21   there are other products with somewhat similar

22   capabilities in the market place.

23        Q.  Is there any common name for this software

24   genre?

25        A.  I think I took -- you know, this is generally,

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

1      Q.  And what's the -- the second option there?

2      A.  The second one is called "Custom."

3      Q.  Parentheses, advanced --

4      A.  Yes.

5      Q.  -- end parentheses?

6             And what do you understand that to do?

7      A.  That -- that appears to -- well, that's a

8   new -- more of a new installation and does not retain as

9   much information as before.  Although you can go in and

10  customize and change exactly what it does, and that's

11  why it's called advanced, is there are more choices.

12     Q.  So earlier you -- you mentioned that some of

13  the -- the errors that you saw in the log on -- on the

14  image suggests that the plaintiff was likely

15  experiencing the same problems or issues immediately

16  prior to installing a new operating system.  Is that --

17  is that correct?

18     A.  Yes.

19     Q.  Okay.  If -- if that was the case, would it be

20  unreasonable to install a new copy of Windows?

21             MR. BORCIA:  Objection; form.

22     A.  I think in this case it would be very

23  unreasonable, 30 days prior to the filing of a lawsuit

24  in which your engagement letter with the law firm says,

25  "Don't remove" -- "Don't spoil any of your evidence," to

bb57c8a0-3786-4f7e-917c-c665ceeebdda

Monty  G. Myers - 12/21/2016

1  go reformat your hardware completely.  Yeah, I think it
2  would be very inappropriate.
3       Q.  (BY MR. MISSAGHI)  Okay.  Now, absent that
4  reason that you just provided, would it be unreasonable
5  to install a new copy of Windows if you were
6  experiencing the types of errors that you suggest the
7  plaintiff was experiencing prior to installing a new
8  version of Windows?
9       A.  Based on the facts I've seen, it seems pretty
10  unreasonable, given that additional facts come into
11  play, that -- I believe your plaintiff says he bought a
12  new computer and wasn't really using this computer, and
13  so he had another computer.  Now he's going back and --
14  he had another reason to reformat this.  So that
15  seems -- again, I would say -- so even absent the first,
16  I don't know why he would be, you know, reformatting.
17  It's a time-consuming process.  You know, what would be
18  the reason to do that if it's really not his primary
19  computer at that point?
20       Q.  You say in your report that you saw activity
21  after the date of the reinstallation of Windows.  Is
22  that correct?  Usage information, that somebody was
23  using the computer?
24       A.  To some degree, yes, yeah.  I haven't really
25  endeavored to see how much it was used.  But, you know,

CERTIFIED COURT REPORTERS AND VIDEO, LLC
(855) 227-8552

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty G. Myers - 12/21/2016**

```
 1    if you even turn it on or access it, the log files show
 2    that activity is -- is taking place.
 3         Q.  But you don't -- you didn't look at how much
 4    activity was being used?
 5         A.  I haven't looked yet.  I probably will now.
 6         Q.  Okay.  So again, going back to the -- the
 7    original question, if somebody was experiencing the
 8    types of problems that you suggest Plaintiff -- I'm not
 9    saying Plaintiff.  I'm saying if a person, hypothetical
10    person, was experiencing the types of problems that you
11    suggest Plaintiff was experiencing immediately prior to
12    the reinstallation of Windows, would it be unreasonable
13    to install a new copy of Windows?
14              MR. BORCIA:  The problem with your question
15    is, it doesn't frame the facts.
16              MR. MISSAGHI:  If he understands the
17    question, he can answer.
18              MR. BORCIA:  No, no.  I --
19              MR. MISSAGHI:  Are you objecting to the
20    question?
21              MR. BORCIA:  Yes, I am objecting, because
22    it's vague.  Are you suggesting --
23              MR. MISSAGHI:  Can you read back the
24    question, please?
25              (Requested portion was read.)
```

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

```
 1                  MR. BORCIA:  So does this hypothetical
 2    person you're saying is not the plaintiff, is that
 3    person about to --
 4                  MR. MISSAGHI:  Jim --
 5                  MR. BORCIA:  No, no, no, no.
 6                  MR. MISSAGHI:  -- this is a speaking
 7    objection.
 8                  MR. BORCIA:  No.
 9                  MR. MISSAGHI:  You're entitled to make an
10    objection.
11                  MR. BORCIA:  Okay.  You're question --
12                  MR. MISSAGHI:  And you may instruct him --
13                  MR. BORCIA:  You don't -- you don't --
14                  MR. MISSAGHI:  You don't need to do a
15    speaking objection, Jim.  You can instruct him not to
16    answer.  You can put your --
17                  MR. BORCIA:  I'm doing that.
18                  MR. MISSAGHI:  Right.
19                  MR. BORCIA:  What I'm saying --
20                  MR. MISSAGHI:  This is improper.
21                  MR. BORCIA:  No, it's not improper.
22                  MR. MISSAGHI:  It is improper.
23                  MR. BORCIA:  No, it's not improper.
24    Because your question, does it assume this person --
25                  MR. MISSAGHI:  I can ask him a question --
```

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

```
 1                   MR. BORCIA:  Let me finish.
 2                   THE REPORTER:  Speak one at a time, please.
 3                   MR. BORCIA:  Let me finish.  Does your
 4       question assume the person is about to file a lawsuit?
 5       Does your question assume that the person is still using
 6       the laptop --
 7                   MR. MISSAGHI:  See, Jim --
 8                   MR. BORCIA:  No, no, I can finish, Amir.
 9                   MR. MISSAGHI:  -- this is improper.
10                   MR. BORCIA:  I can finish, Amir.
11                   MR. MISSAGHI:  In front of the witness --
12                   MR. BORCIA:  No, no, I -- I --
13                   THE REPORTER:  You're speaking over each
14       other, and I can't make a record.
15                   MR. BORCIA:  Let me finish.  Your question
16       is vague, and I can explain why it's vague.  It doesn't
17       respond to or -- or explain:  Is the person filing a
18       lawsuit?  Is the person still using the computer?  Is
19       the person using a different computer?
20                   So your -- your question is incomplete and
21       vague and doesn't frame enough for the witness to give
22       an answer.
23                   MR. MISSAGHI:  Are you done?
24                   MR. BORCIA:  Yeah.
25           Q.  (BY MR. MISSAGHI)  Can you answer the question?
```

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

```
 1        A.  Can we hear the question again, or read it
 2   back, please?
 3                  (Requested portion was read.)
 4                  MR. BORCIA:   Same objections.
 5        A.   I'm not sure I understand, you know, exactly
 6   what you mean by this hypothetical person.  But, you
 7   know, assuming this person had no relationship to
 8   litigation or anything, if that's -- if that's what
 9   you're trying to suggest, it might be a reasonable step
10   in the same way using -- again, I -- I went through this
11   before.
12                  An older computer, as -- as we have here,
13   if it's having issues, you might try a SpeedyPC project.
14   You know, the computer's limited value, you're trying to
15   decide if it's going to work, if you need a new
16   computer.  You might try SpeedyPC, you might reformat
17   your drive or reinstall your operating system.  So I
18   would say it might be a reasonable step under certain
19   circumstances.
20        Q.  (BY MR. MISSAGHI)  In paragraph 62, you state,
21   "It is noteworthy that the Windows Vista Operating
22   System was known for its performance and compatibility
23   issues with many of the hardware configurations in use
24   at the time of its release," and then continues.  But
25   my -- my question is -- I -- I guess I don't understand.
```

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

1    Q.  And then underneath that, it says, "SpeedyPC

2  Pro has determined that your system needs to be

3  scanned."  Do you see that?

4    A.  Yes.

5    Q.  Now, you probably heard me put emphasis on --

6  on "system" right there.

7    A.  Yes.

8    Q.  Where is it drawing a distinction between

9  things that it can fix and things it can't fix?

10  Where -- does it -- does it say that at all?

11    A.  It does to me.  I mean -- you know, I don't

12  think you can go scan hardware.  I mean, the first

13  sentence you just read is, "the system needs to be

14  scanned."  It is looking at the soft transient material

15  on that computer.  It can't do a hardware -- it's not

16  looking at your -- your defective hardware.  And so I

17  don't -- so to me, that's -- that's what it says.  It --

18  it doesn't imply to me that there's a hardware checking

19  module in here, if there -- even if there was one.

20    Q.  So "system," to you, means only whatever

21  SpeedyPC can fix?

22        MR. BORCIA:  Objection; mischaracterizes

23  his testimony.

24        You can answer.

25    A.  I think in both -- next to both times that

---

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

**Monty G. Myers - 12/21/2016**

1  it, in essence, to say I -- this is not part of my

2  indexing system.

3            But that's exactly what -- you know, we

4  talked about EnCase.  The EnCase tool helps us go out

5  and scour the drive and find deleted information that --

6  and so that's where it was found.  These were not files

7  that were still on the computer, but they had been

8  deleted.

9      Q.  Now, you're saying deleted.  Are you making any

10 inferences there on how -- how that information was --

11 and how that information ended up in the slack space?

12     A.  No.  It was just deleted by -- by some

13 operation.  Somebody started an operation that deleted

14 those files at some point.  That's all we know.

15     Q.  So you're not implying that somebody -- let me

16 say this.  You're not implying that somebody selected a

17 file, pressed delete, like that.  It could be as a

18 result of the reformatting and installation of a new

19 operating system?

20     A.  It might -- it could be probably either of

21 those types of operations.

22     Q.  And slack space, is that another way of saying

23 unallocated space?

24     A.  Yes.

25     Q.  Okay.  So what -- what specifically -- what

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

1    specific fragments did you find?

2         A.  I had about five.  You know, we didn't try to

3    go down the list of all of them, but we found probably

4    five individual files.  I don't remember the names.

5    They're very distinctly named files that were installed.

6    And so I found evidence --

7              And to be clear, I don't think the

8    evidence -- those could have been put on the system

9    after the reformat.  It was not -- the -- the system, it

10   was not -- there was not -- because of all the

11   manipulation of that computer, you could not tell when

12   that material had been on the computer.  Could have been

13   before, could have been after.  It's just undetermined,

14   based on my analysis so far.

15        Q.  Okay.  Going down to c.  And this is all under

16   the things that you were prevented from performing, the

17   important tasks you were prevented from performing.  One

18   of them, c, "Determining the configuration of the

19   SpeedyPC Pro software on Plaintiff's laptop."

20             Were you able to at all determine the --

21   the configuration of the SpeedyPC Pro software on

22   Plaintiff's laptop?

23        A.  No.  There was no information to describe that.

24        Q.  What about d, "Determining what, if any, issues

25   the SpeedyPC Pro software identified on Plaintiff's

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

1    laptop and whether the SpeedyPC Pro addressed or

2    attempted to address issues and how"?

3         A.  Again, that's the kind of thing we would have

4    liked to have figured out, but we were not able to

5    determine any of that.

6         Q.  So you said you found five files, and then you

7    didn't do an exhaustive search of the rest?

8         A.  Keep in mind, these are not -- these aren't

9    really complete files.  All we're finding is that these

10   files by these names were on the drive.

11              So doing exhaustive work, most of these

12   files might have been partial or not even complete.  So

13   it would be un -- you know, really a waste of time.  We

14   were showing that files by these unique names at some

15   point existed; but the content of those files is -- is

16   questionable, if that makes sense.

17        Q.  Okay.  And I'm sorry.  Was it -- was it Kevin

18   who did the -- the EnCase work?

19        A.  Yeah, he worked with me on that.  But, yeah, he

20   does a lot of the initial grunt work.  I ask him, "I

21   want you to go look at this and probe this," and then we

22   go down and review it together.

23        Q.  Do you know whether he performed keyword

24   searches?  You said, in response to b, that you found

25   names of files.

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty G. Myers - 12/21/2016**

1      A.   Probably so.

2      Q.   Okay.

3      A.   One of the -- one of the things EnCase can do

4  is allow you to search and find.  So we have a list of

5  file names that we might look for, and that's what we

6  would do.

7      Q.   Do you know what keywords he used?

8      A.   I don't remember the specific one.  Again, we

9  were mapping to what was -- gets installed with

10 SpeedyPC.

11     Q.   Do you know whether you or Kevin still has that

12 list of keywords?

13     A.   I bet we can find it.  Yeah, probably do.

14     Q.   Okay.  I -- I may have asked a similar question

15 before.  Were you able to determine, from your analysis

16 of the computer, everyone who had access to his

17 computer?  For instance, did you see multiple user

18 names, log-in items, things like that?

19     A.   I remember a discussion of that, but I don't

20 recall -- honestly don't recall it being material.  So

21 we did some work, but I honestly don't recall it being

22 material and me looking at it.

23     Q.   All right.  Paragraph 70.  The second to last

24 sentence there starting with, "Formatting a hard drive."

25     A.   Uh-huh.

bb57c8a0-3786-4f7e-917c-c665ceeebdda

Monty  G. Myers - 12/21/2016

1       Q.  Do you see that?

2       A.  Yes.

3       Q.  You say, "Formatting a hard drive is a

4  destructive process that removes everything on the drive

5  and creates a new file system, after which an operating

6  system is installed."

7       A.  Yes.

8       Q.  Is -- is that entirely accurate?

9       A.  Well, keep in mind, I'm trying to speak to a

10  pretty non-technical audience, so I think it's accurate.

11  You know, it is -- it is a destructive process.  For

12  practical purposes, it removes everything.  As I just

13  mentioned -- I mean, and this whole section is talking

14  about what's found in slack space.  So from a practical

15  perspective, it does delete all of the normal

16  information.

17              You can, through very complex means, find,

18  you know, this unallocated space and -- and stuff like

19  that.  So -- so I -- I think it's accurate.  It's just

20  not trying to be the definitive statement on all of the

21  nuances of the way formatting occurs.

22       Q.  Right.  But you say it removes everything.  You

23  don't qualify that at all.  Right?

24       A.  Yes.  That's probably -- means the data.  I

25  mean, the main thing I'm talking about, we're talking

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty G. Myers - 12/21/2016**

1    about the data.  You know, formatting kind of removes

2    and kind of creates a blank disc, if you will, is the

3    way to think about it.  So it does create a -- sort of

4    lays it out and has it in a blank state.

5        Q.  My understanding of formatting is that it

6    doesn't remove the data on -- on the disc.  Instead, it

7    basically creates a new index to point to data on the

8    disc.  Is that correct?

9        A.  Well, there are multiple types of formats.  And

10   so it is true that -- you know, again, I guess for

11   practical purposes, I said it recreates the index.  And

12   you can't even access -- a normal person can't even

13   access the other stuff.

14              So it -- by creating a new index, you can't

15   find -- anything that was on the big drive is not

16   accessible without specialized tools and mechanisms.  So

17   I think we're saying the same thing there.

18       Q.  Did the reformatting that occurred on

19   Plaintiff's laptop, was that the type that would change

20   just the -- the index or another type that would do

21   something else to the data?

22       A.  So it -- it completely recreated the index,

23   which, in essence, lets go of all the former data that

24   was on the drive, okay?  So now with -- as we just

25   talked about a second ago, in those sort of released

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

```
 1   areas of the disc, there are remnants of that.  And I
 2   talked about the remnants.  That's how I was able to
 3   determine that SpeedyPC was on there.  That's through
 4   advanced forensics tools.
 5              But from a practical perspective, it -- it
 6   deletes that stuff, and then it gets overwritten.  At
 7   that point it frees up all of that -- you know, what was
 8   there previously can get overwritten by new material.
 9   So then you put the operating system and all that stuff.
10   It starts to overwrite those spaces.  Sometimes they get
11   overwritten, sometimes they don't.
12              And so it can be by luck that you -- like
13   the fragments that we found, could have been
14   overwritten.  They may have been there originally.  But
15   if someone keeps using the computer, they might get
16   overwritten.
17       Q.  Are there ways to ensure that data on the
18   unallocated space is not accessible?
19       A.  There are advanced tools people use.  And, you
20   know, there's FBI standards and tools that Department of
21   Defense and -- you know, so there are -- there are tools
22   that people that -- you -- you typically go get a
23   specialized tool to do that.
24              Can we take a short break?
25       Q.  Yeah, absolutely.
```

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

```
 1              THE VIDEOGRAPHER:  Going off the record.
 2   Time is 2:18.
 3              (Recess.)
 4              THE VIDEOGRAPHER:  Back on the record.
 5   Time is 2:28.
 6       Q.  (BY MR. MISSAGHI)  I'll draw your attention to
 7   paragraph 79 --
 8       A.  Okay.
 9       Q.  -- on page 22.  You state, "While I am aware
10   that log files on a computer can get full over time and
11   older log entries can be overwritten by newer entries so
12   that they may not reflect the entire history of the
13   computer, this overriding process does not change the
14   creation date of such log file, and in my experience, it
15   takes a lot of time with very" hever -- "heavy user
16   activity for such log files to become full and start
17   overwriting themselves."  Did I read that correctly?
18       A.  Yes.
19       Q.  Do you have any understanding of -- of how much
20   time it would take for such log files to become full and
21   start overwriting themselves?
22       A.  Yes.  I mean, just generally speaking, it
23   takes, you know, years for most of those.  The
24   default -- users can change defaults.
25              We looked at the PC in this case, and it
```

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G.  Myers - 12/21/2016**

 1    was gigabytes of -- of space, and it was not even close.

 2    It was just a small fraction of that system, so -- so we

 3    did actually look at it on this PC.

 4        Q.  Is SpeedyPC designed to scan for log files?

 5        A.  Certain log files.  Not all log files, but some

 6    log files.

 7        Q.  Did you check whether the log files that you're

 8    discussing here in paragraph 79 are of the type that

 9    SpeedyPC scans for?

10        A.  The type we're talking about here are not

11    scanned for by SpeedyPC.

12        Q.  In 81, paragraph 81, you say, "Reformatting/

13    reinstall event that I observed on Plaintiff's laptop is

14    not an action that could happen accidentally or

15    unexpectedly on a computer, but rather is the type of

16    activity that requires deliberate and intentional

17    decision and set of actions on the part of a reasonably

18    experienced computer user in order to properly

19    complete."  Did I read that correctly?

20        A.  Yes.

21        Q.  What do you mean by a reasonably experienced

22    computer user?

23        A.  What I mean by this is that even to get to the

24    point, typically, of reformatting your disc, you're --

25    you're typically having to go to some areas of Windows

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

```
 1    that -- to initiate the process of an upgrade or an
 2    install.
 3                    And that's -- I use my 75-year-old mom as
 4    an example.  She would not endeavor to do that.  You
 5    have to have at least some basic knowledge of how to,
 6    you know, go down the road of upgrading your operating
 7    system or formatting your drive.  The way the software
 8    is written, as you saw earlier, you know, it pops up
 9    decisions.  And that doesn't just happen -- you know,
10    just start running those.  There will be warnings that
11    this is going to delete your data.  And that's what I
12    mean, you know.
13                    To -- to go through that process, it's
14    going to in -- inform the user -- it's going to be a
15    deliberate process that is also informing the user of
16    those steps.
17        Q.  In paragraph 82 you state, "I am not able to
18    determine from the forensic image what, if any, cause or
19    justification Plaintiff may have had for formatting/
20    installing the operating system on the hard drive of his
21    laptop."  Did I read that correctly?
22        A.  Yes.
23        Q.  Then in the -- the next paragraph you start,
24    from a technical/forensic perspective.
25                    So what's the difference between
```

Monty  G. Myers - 12/21/2016

1   paragraph 83 and 82?  Why in paragraph 82 are you unable

2   to determine the justification, but in 83 it seems that

3   you're able to -- to determine a justification?

4        A.  I need to read the two so I can --

5        Q.  Sure.

6        A.  -- understand.  Thanks.  (Examines document.)

7             MR. BORCIA:  Objection is you're

8   mischaracterizing the paragraphs.

9             You can answer.

10       A.  So I think there's sort of two separate -- the

11  first one, 82, is saying that there's nothing in the

12  image itself that says this was performed for this

13  reason.  There's -- you know, there's no hard tangible

14  information that says why that process was undertaken.

15             83 is looking at the broader spectrum that

16  we've already talked about.  We have a case where the

17  plaintiff claims to have these issues; he's engaged with

18  a law firm; has a letter that says not to delete, you

19  know, to maintain certain evidence and materials.  And a

20  month before the case is filed -- these -- these are, as

21  I just stated previously, deliberate, non-trivial

22  actions on the computer.

23             So -- so 83 is addressing that just --

24  there's -- there's no -- it doesn't make any sense.

25  There -- there's no reason I can see, under those

bb57c8a0-3786-4f7e-917c-c665ceeebdda

Monty G. Myers - 12/21/2016

1   circumstances, that a reasonable person would undertake

2   that process. I think that's paraphrasing, but that's,

3   I think, what -- what we're saying in 83.

4       Q. (BY MR. MISSAGHI) One of the things you

5   mention in paragraph 83 is concern that the content of

6   his laptop would not support the allegations of this

7   lawsuit.

8             What -- what would -- if -- if you had

9   found something that doesn't support the allegations of

10  the lawsuit, what types of things would it be?

11      A. It could be other types of problems with the

12  system or his network; or it could be, you know, a range

13  of things.

14      Q. Are those the only examples you can think of?

15      A. It could be that he never actually ran the --

16  the -- the non-free version of the software. It could

17  be that the software ran fine. It could be a lot of

18  things. It's just all hype -- you know, it's until

19  we -- you know, again, the re -- our goal was to get the

20  actual material and actually test it and see what it

21  did. And that's what -- so there'd be a lot of

22  allegations made that just simply weren't true. And

23  that's what I would have tried to independently

24  validate.

25      Q. In paragraph 84 you state that it -- the -- the

bb57c8a0-3786-4f7e-917c-c665ceeebdda

```
 1    reformatting ". . . made it impossible for me to find
 2    the relevant log and application data needed to
 3    determine much of anything that occurred on Plaintiff's
 4    laptop related to the SpeedyPC Pro software at the time
 5    that Plaintiff claims to have downloaded, installed and
 6    used such software."  Did I read that right?
 7        A.  Yes.
 8        Q.  Is that referring to that list, a, b, c and d
 9    from paragraph 65?
10        A.  I think that's be -- that's in addition to
11    those items.  There may be some overlap.
12            The -- Windows has a very advanced event
13    management system.  It's -- it's there.  It tracks a lot
14    of information.  That would have been -- one of the
15    treasure troves of information would have been that
16    event management system and all those logs that would
17    have really told us what was happening on that computer.
18    And those were deleted and, you know -- and, you know,
19    part of that process.
20            So that -- you know, again, while there's
21    other things that would have been important, those would
22    have been relevant and had a complete -- probably a --
23    likely a complete history.
24            In the same way those same event tables
25    were interesting even after the fact, they would have
```

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

```
 1    been even more interesting going back to the exact date
 2    that the actual software, SpeedyPC software, was
 3    installed.
 4         Q.  In paragraph 85, is that referring to those
 5    five or so fragments that we discussed earlier?
 6         A.  Yes.
 7         Q.  And through those you were not able to
 8    determine if SpeedyPC was properly downloaded, installed
 9    and run?
10         A.  (Nods head affirmatively.)
11         Q.  Is that a yes?
12         A.  That's correct.
13         Q.  And you were not able to determine the
14    configuration of the SpeedyPC Pro software?
15         A.  That's correct.  And just -- just to be clear,
16    the -- the -- the remnants that exist after a reformat
17    and install are -- are very much destroyed in a case --
18    in a -- in a position of not having much value.  We
19    can -- it's sort of like -- sort of an explosion occurs;
20    you see bits and pieces; you -- you -- you can maybe see
21    that this was a part of this file or this file, but it's
22    not a cohesive thing, typically, that you can analyze
23    and look at.
24              Now, it can vary, but that's -- that is --
25    that's the typical case.  So this -- these remnants are
```

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty G. Myers - 12/21/2016**

```
 1    not valuable, generally, other than to say -- in this
 2    case, we could say that it was installed because at
 3    least this unique name would not have existed.
 4         Q.  In cases other than this, have you provided
 5    testimony about files recovered in -- or information
 6    recovered in unallocated space?
 7         A.  Yes.
 8         Q.  And have you ever put forth the argument that
 9    that information should be considered?
10         A.  I don't recall specifically.  But there have --
11    there's like -- it wouldn't surprise me if there are
12    cases.
13              And again, you've got to look at the
14    timeframe, if it -- when a deletion occurs, if it's
15    immediately recovered.  And there's -- there's a lot of
16    things that -- you know, if you -- if something's
17    deleted as part of a reformat is different than deleting
18    an individual file, because those are wholesale changes
19    to the entire disc.
20              So it varies.  It -- it depends on a lot of
21    different things.  But I -- I don't recall one way or
22    the other on -- on whether I testified to that.
23         Q.  But you have proffered opinions about --
24    relating to information recovered from unallocated
25    space?
```

Monty G. Myers - 12/21/2016

Page 253

```
 1                    MONTY G. MYERS

 2                  December 21, 2016

 3               CORRECTIONS AND SIGNATURE

 4     PAGE/LINE    CORRECTIONS           REASON FOR CHANGE

 5     83/13        advice → device       mistranscribed

 6     93/2         vir → virus           mistranscribed

 7     98/7         does → dub            mistranscribed

 8     111/21       rep → wrap            mistranscribed

 9     113/11       rep → wrap            mistranscribed

10     123/13       project → product    mistranscribed

11     142/2        contemplates → complicates  mistranscribed

12     176/25       means → doesn't mean  mistranscribed/misstated

13     193/8        qar → bar            mistranscribed

14     201/3        wald → wouldn't       mistranscribed

15     201/18       insert 'crumbs' after bread  mistranscribed/misstated

16     207/8        consumer → computer   mistranscribed

17     232/19       insert 'No, but after A.  misstated

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24     _____

25     _____
```

**Monty G. Myers - 12/21/2016**

Page 254

```
 1                    SIGNATURE OF WITNESS

 2

 3          I, MONTY G. MYERS, solemnly swear of affirm

 4     under the pains and penalties of perjury that the

 5     foregoing pages contain a true and correct transcript of

 6     the testimony given by me at the time and place stated,

 7     with the corrections, if any, and the reasons therefor

 8     noted on the foregoing correction page(s).

 9

10                         MONTY G. MYERS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

Page 255

```
 1            IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
 2
 3    ARCHIE BEATON,            )
      individually and on       )
 4    behalf of all others      )
      similarly situated,       )
 5                              )
              Plaintiff,        )
 6                              )  Case No. 1:13-cv-08389
      VS.                       )
 7                              )
      SPEEDYPC SOFTWARE, a       )
 8    British Columbia          )
      company,                  )
 9                              )
              Defendant.        )
10
11                REPORTER'S CERTIFICATION
            VIDEOTAPED DEPOSITION OF MONTY G. MYERS
12                 TAKEN December 21, 2016
13
14    COUNTY OF TRAVIS  )
15    STATE OF TEXAS    )
16        I, Kelly E. Fisher, a Certified Shorthand Reporter
17    in and for the State of Texas, hereby certify to the
18    following:
19        That the witness, MONTY G. MYERS, was duly sworn by
20    the officer and that the transcript of the oral
21    deposition is a true record of the testimony given by
22    the witness;
23        That the deposition transcript was submitted on
24    _____, 2017, to the witness or to the
25    attorney for the witness, for examination, signature,
```

bb57c8a0-3786-4f7e-917c-c665ceeebdda

**Monty  G. Myers - 12/21/2016**

Page 256

```
 1   and return to CERTIFIED COURT REPORTERS AND VIDEO, LLC,

 2   by _____, 2017;

 3        That the amount of time used by each party at the

 4   deposition is as follows:
          Mr. Amir C. Missaghi - 6:38
 5        Mr. James K. Borcia - 00:00

 6        I further certify that I am neither counsel for,

 7   related to, nor employed by any of the parties or

 8   attorneys in the action in which this proceeding was

 9   taken, and further that I am not financially or

10   otherwise interested in the outcome of the action.

11        Certified to by me this _____ day of

12   _____, 2017.

13

14

15

16

17                              _____
                                KELLY E. FISHER, CSR No. 2834
18                              Expiration Date: 12-31-17
                                CERTIFIED COURT REPORTERS AND VIDEO, LLC
19                              Firm Registration No. 751
                                100 Sander Road
20                              Golden, Colorado 80403
                                855-227-8552

21

22

23

24

25
```

**CERTIFIED COURT REPORTERS AND VIDEO, LLC**
**(855) 227-8552**

bb57c8a0-3786-4f7e-917c-c665ceeebdda