IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ARCHIE BEATON, individually )
and on behalf of all others )
similarly situated, )
)
            Plaintiff, )
)
   vs. ) No. 1:13-cv-08389
)
SPEEDYPC SOFTWARE, a British )
Columbia company, )
)
          Defendant. )

     The confidential deposition of ARCHIE
BEATON, called by the Defendant, taken pursuant to
the Federal Rules of Civil Procedure of the United
States District Courts pertaining to the taking of
depositions, taken before PEGGY CURRAN, CSR, CRR,
RPR, CSR License No. 084-002016, a notary public
within and for the County of DuPage and State of
Illinois, taken at 223 South Wacker Drive, 22nd
Floor, Chicago, Illinois, on Thursday, July 28,
2016, commencing at the hour of 9:09 a.m.



EXHIBIT
B

CONFIDENTIAL

ARCHIE BEATON

## Page 6

1   I am going to mark the transcript confidential and
2   then afterwards, if possible, we can go through and
3   see what needs to be marked confidential and what
4   isn't.
5       MR. BORCIA:  That's fine.
6   By Mr. Borcia:
7       Q   Where do you reside?
8       A   ███████████████████████████
    █ ██████████
10      Q   Who do you live there with?
11      A   My family.
12      Q   Are you married?
13      A   Currently not.
14      Q   So who lives in your house with you?
15      A   I have a girlfriend, a six-month-old
16  son, and an 11-year-old daughter.
17      Q   The girlfriend's name?
18      A   Catherine.
19      MS. BOOTH:  Just an objection based on
20  relevance for these questions.
21  By Mr. Borcia:
22      Q   You can answer.  Catherine what?
23      A   Kagali.
24      Q   Spell that.

## Page 7

1       A   K-a-g-a-l-i.
2       Q   Is Catherine employed?
3       A   Currently, no.
4       Q   Is she the mother to your children?
5       A   She is.
6       MS. BOOTH:  Same objection.  If I can just
7   assert this objection for the remainder of the
8   questions related to family.
9   By Mr. Borcia:
10      Q   Have you been married before?
11      A   I have.
12      Q   How many times?
13      A   Once.
14      Q   Wife's name?
15      A   Delores, same last name, Beaton,
16  B-e-a-t-o-n.
17      Q   Where does she reside?
18      MS. BOOTH:  I'm just going to sustain my
19  relevance objection for all of these questions.
20      THE WITNESS:  She resides in Dearborn,
21  Michigan.
22  By Mr. Borcia:
23      Q   When were you married to her?
24      A   1986.

## Page 8

1       Q   Until when?
2       A   Three years ago, four years ago,
3   something like that.  Three, four, years ago.  I'm
4   not certain.  I would have to look up the divorce
5   decree.
6       Q   Before or after the lawsuit was filed?
7       A   After the lawsuit was filed.  I'm
8   guessing though.
9       Q   Where was the divorce proceeding?
10      A   Monroe County.  Not Monroe County.
11  McHenry County.
12      Q   Do you have any children with her?
13      A   Two.
14      Q   Names?
15      A   Shea Beaton, S-h-e-a, and Angus,
16  A-n-g-u-s, Beaton.
17      Q   Boys or girls?
18      A   Boy and girl.
19      Q   Shea is a boy?
20      A   Shea is a girl.  Actually she is a
21  woman.  She has three kids.
22      Q   Where does Shea live?
23      A   She lives in Mountain Home, California.
24  Mountain House.

## Page 9

1       MS. BOOTH :  Jim, can I just ask what the
2   relevance of these questions are?
3       MR. BORCIA:  You can make an objection.
4       MS. BOOTH:  I have made the objection and
5   sustained it through all family related questions.
6       MR. BORCIA:  You don't sustain objections, you
7   make objections.  The Judge would have to rule on
8   objections.
9       MS. BOOTH:  I was --
10      MR. BORCIA:  I don't need to explain to you my
11  questions.
12      MS. BOOTH:  Jim, I was just trying to be
13  cordial here and not have to object after every
14  question.
15      MR. BORCIA:  You have already had a standing
16  objection, which I allowed you to have.
17      MS. BOOTH:  That's what I meant.
18      MR. BORCIA:  So you don't need to make anymore
19  comments.
20      MS. BOOTH:  Okay.
21  By Mr. Borcia:
22      Q   Is Shea employed?
23      A   Student.
24      Q   Where?

CONFIDENTIAL

ARCHIE BEATON

## Page 18

1   Q   After computer graphics -- let me ask
2 you.  Why did you leave there?
3     A   Better opportunities.
4     Q   Where did you go next?
5     A   That's when I went to Container
6 Graphics.
7     Q   Why did you leave Container Graphics?
8     A   Better opportunities.
9     Q   Who was your supervisor at Computer
10 Graphics?
11    A   I don't remember.  Jeff something or
12 other.  I really don't remember.
13    Q   Where did you go after Computer
14 Graphics?
15    A   Went to a company --
16    Q   I am sorry, you said Container
17 Graphics?
18    A   Container Graphics.
19    Q   My apologies.
20    A   Then I went to work for a company called
21 Lyons Falls.
22    Q   Where were they located?
23    A   That was located in Lyons Falls,
24 New York.

## Page 19

1     Q   What was your position there?
2     A   Sales manager.
3     Q   Was that a printing company?
4     A   It was a paper mill.
5     Q   How long did you work there?
6     A   About three years.
7     Q   Who did you report to there?
8     A   Larry Canon.
9     Q   Why did you leave there?
10    A   I started a new company called the
11 Chlorine Free Products Association.
12    Q   When you worked in Lyons Falls, where
13 did you live?
14    A   In Algonquin.
15    Q   So did you commute to New York?
16    A   Periodically.
17    Q   So you worked out of your home in
18 Algonquin?
19    A   No, we had an office in Crystal Lake.
20 That's where Larry lived.
21    Q   So you worked mostly out of the Crystal
22 Lake office?
23    A   Yes.
24    Q   Then you started your own company, you

## Page 20

1 said it was called Chlorine Free Products
2 Association?
3     A   Yes, sir.
4     Q   What year was that?
5     A   I'm going to say 1994.
6     Q   What type of company is that?
7     A   International standards and
8 accreditation.
9     Q   What does that mean?  What do you do?
10    A   I'm an expert on sustainability in
11 manufacturing processes.  We have a certification
12 program and audit and principles.
13    Q   Where is that company located?
14    A   102 North Hubbard.
15    Q   Is it your home?
16    A   It's in an office.
17    Q   In Algonquin?
18    A   Yeah.
19    Q   In an office at your home residence?
20    A   It's above the garage, 22 by 26 room.
21    Q   That company, is it an Illinois
22 corporation?
23    A   It is.
24    Q   What's your position there?

## Page 21

1     A   Executive director.
2     Q   Are there any other officers?
3     A   None.
4     Q   Any other directors?
5     A   None.
6     Q   Any other shareholders?
7     A   None.
8     Q   Is the company in good standing today?
9     A   It is.
10    Q   Who are the employees of the company?
11    A   Currently we have no employees but
12 myself.
13    Q   Have you ever had employees?
14 MS. BOOTH:  Objection; based on relevance.
15    By Mr. Borcia:
16    Q   You can answer.  You can answer.
17    A   Many.  We've had as many as ten on staff
18 at times.
19    Q   When is the last time you had
20 employees?
21    A   About four years ago.
22    Q   Tell me who are the customers of the
23 company?
24 MS. BOOTH:  Objection; relevance as well.  I

6 (Pages 18 to 21)

CONFIDENTIAL

ARCHIE BEATON



| Page 46 | Page 48 |
|---|---|

**Page 46**

**Page 48**

1  good standing?

2      A    It is.

3      Q    Have you given any type of statements

4  for this lawsuit?

5      MS. BOOTH:  Objection.  I think that's a

6  confusing question.

7      By Mr. Borcia:

8      Q    You can answer.

9      A    I'm not sure what you're asking.

10      Q    Have you provided any type of statements

11  to anyone about the lawsuit, outside of your

12  counsel and here today?

13      A    No.

14      Q    Have you discussed this lawsuit with

15  anybody else besides your counsel and besides here

16  today?

17      A    No.

18      Q    When I say discussed, I mean not only

19  verbally but also e-mail, texting, any type of

20  electronic or written correspondence, anything like

21  that.

22      A    None.

23      Q    So have you communicated with any of the

24  class members in this case?

**Page 47**

24      Q    Is your Illinois license currently in

**Page 49**

1      A    No.

2      Q    Have any class members communicated with

3  you?

4      A    No.

5      MS. BOOTH:  Just to raise a past objection,

6  objection, speculation based on I don't believe he

7  knows who the -- I don't believe he knows who all

8  the class members are.

9      By Mr. Borcia:

10      Q    Do you know any of the class members?

11      A    No.

12      Q    So all of the documents that you said

13  you were reviewing to prepare for the deposition,

14  that did not include the names of any class

15  members; is that right?

16      A    No.  Yeah, that's right.

17      Q    Why did you file this lawsuit?

18      A    I was frustrated.  I bought a product

19  that I thought was going to help me and it only

20  caused me problems.

21      Q    When did you purchase the product?

22      A    Around August of 2012, 2013 -- 2012 I

23  think.  It's in the documents that we filed, the

24  actual date, the download and all the good stuff.

CONFIDENTIAL

ARCHIE BEATON

**Page 62**

1    Q    I am asking you what type of software
2  was downloaded onto the laptop, outside of
3  SpeedyPC Pro?
4    A    Well, that's a good question.  I would
5  have to ask whoever is looking at the hard drive to
6  tell me because I don't recall.
7    Q    Did you ever uninstall software that was
8  loaded onto your computer?
9    A    Yes.
10   Q    What did you uninstall?
11   A    Speedy Pro.
12   Q    When?
13   A    As quickly as I could.
14   Q    Why?
15   A    Because it was slowing my computer down
16 and causing it to crash and give me red flashing
17 lights that kept scaring the crap out of me,
18 telling me that it was critical, it was serious,
19 and it was security.



**Page 63**



9    By Mr. Borcia:
10   Q    Anyone beside yourself use that
11 laptop?
12   A    No.
13   Q    Your wife and girlfriend never used
14 it?
15   A    No.
16   Q    Correct?
17   A    Correct.
18   Q    None of your employees used it?
19   A    No.
20   Q    Correct?
21   A    Correct.
22   Q    What made you look to purchase utility
23 software, why did you do that?
24   A    Well, when I was planning for a

**Page 64**

1  presentation, the computer kept blinking and giving
2  me problems with being able to operate.
3    Q    You say it was blinking.  Does that mean
4  the power was shutting on and off?
5    A    No, the screen was flashing
6  periodically, kind of giving me these error codes
7  that I wasn't familiar with.
8    Q    When did you first start getting those
9  error codes?
10   A    Probably about a week before I
11 downloaded Speedy Pro.
12   Q    Prior to that time had you ever
13 investigated or looked into utility software?
14   A    No.
15   Q    So when you got these -- had these
16 problems, what did you do?
17   A    I talked to a couple different friends
18 of mine, asked them what was the best way to deal
19 with it, and they basically said search the
20 internet, so that's what I did.
21   Q    Who were the friends?
22   A    In the office.
23   Q    What were their names?
24   MS. BOOTH:  Objection: relevance.

**Page 65**

1        You can answer.
2        THE WITNESS:  I can't remember if it was one
3  of the -- which one of the staff advised me.  I
4  can't remember.
5        By Mr. Borcia:
6    Q    So these were not -- were they friends
7  or staff members?
8    A    Staff members.
9    Q    Did they tell you any particular place
10 to look on the internet or what products -- did
11 they make recommendations?
12   A    They just said go ahead and type in a
13 search and you will see some things come up.
14   Q    Did you do that?
15   A    I did.
16   Q    What did you type in?
17   A    I typed in critical, serious, computer
18 issues.
19   Q    What came up?
20   A    About 30 pages of programs.
21   Q    What did you do next?
22   A    Well, I kind of sorted through the
23 programs to see which one seemed to be the most
24 professional.

17 (Pages 62 to 65)

CONFIDENTIAL

ARCHIE BEATON

**Page 78**

No. 6 answer that you paid $39.94, correct?

    A   Where is this at?

    Q   Interrogatory No. 6 on page 5.

    Okay.

    Q   You state, "Plaintiff states that defendant charged him, and he paid, $39.94 for the SpeedyPC Pro software."

    A   Again I'm not sure. I don't know how to answer.

    Q   All I am asking you right now, sir, does your interrogatory answer state that "Plaintiff states that defendant charged him, and he paid, $39.94 for the SpeedyPC Pro software"?

    A   I believe there is more than one charge then.

    Q   Sir, I am trying to get you to answer my question.

    A   I don't understand your question.

    Q   Go to page 5, interrogatory No. 6.

    A   I am on page 5 and I see that it says that he paid $39.94 for Speedy Pro.

    Q   So it says, "Plaintiff states that defendant charged him, and he paid, $39.94 for the SpeedyPC Pro software," correct?

**Page 79**

    A   That's what it says.

    Q   That was an answer you gave, correct?

    A   That's correct.

    Q   You reviewed these answers before you signed off on them?

    A   Yes, I did.

    Q   In fact, when you signed off on them, you declared under penalty of perjury that the answers were true and correct?

    A   That's correct.

    Q   So that's the same oath you are taking here today, correct?

    A   That is correct. And to the best of my knowledge I am not sure what you are pulling up here and if there is not another charge in here somewhere.

    Q   So you think there was two charges for the software?

    A   I think there could have been another charge, yes.

    Q   Could have been or was?

    A   I don't recall.

    MS. BOOTH: Objection; argumentative.

**Page 80**

By Mr. Borcia:

    Q   Is there any reference to any other charge for the software in your answer to interrogatory No. 6?

    A   Going back to 2012, I am going to tell you I don't recall.

    Q   All I am asking you right now is does your interrogatory answer reference any second charge?

    MS. BOOTH: Objection; it mischaracterizes -- strike that.

    You can answer his question.

    THE WITNESS: I cannot. I'm sorry, I cannot answer. I cannot tell you if the $34.95 is correct or if the $9.97 is correct.

By Mr. Borcia:

    Q   Let's just make sure we are clear. I didn't reference any $34 charge. What is referenced in the interrogatory response is a charge of $39.94.

    A   You are correct.

    Q   Is there any reference in your interrogatory response to a second charge?

    A   There is not.

**Page 81**

    MS. BOOTH: Objection as to mischaracterizing that. It doesn't say that there wasn't a second charge or any other charge.

    MS. RAPP: The testimony and the interrogatory doesn't say how many charges there were. It just says that the defendant charged him. So to imply that there was a single charge or a second charge is inaccurate.

By Mr. Borcia:

    Q   The interrogatory asks for all facts which form the basis of your claim for damages in this case.

    Are you saying that you are not claiming damages for a possible second charge?

    MS. RAPP: It calls for a legal conclusion.

    MR. BORCIA: No, it doesn't.

    MS. BOOTH: It's calling for an amount of damages, which is a legal conclusion.

By Mr. Borcia:

    Q   You can answer.

    A   I'm not sure how to answer you to be honest. I am just telling you that at the time that I provided this information, it was my belief that we had spent this amount.

CONFIDENTIAL

ARCHIE BEATON

Page 86

1    A    That's correct.
2    Q    These credit card statements, do you
3  receive them on a monthly basis?
4    A    I do.
5    Q    That would include the Visa statement
6  that you used for your business?
7    A    It would.
8    Q    Where is the statement that you would
9  have received in 2012 for the August 24, 2012
10  charge?
11    A    Hopefully it's in a file somewhere.
12    Q    So you have that?
13    A    I don't recall.
14    MR. BORCIA:  We are going to ask that that be
15  produced.
16    MS. BOOTH:  We will look for it and if we have
17  one, we will produce it to you, or if Mr. Beaton
18  has one he will produce it.
19    By Mr. Borcia:
20    Q    If there was a second charge, do you
21  know when that would have been?
22    A    I do not.
23    Q    Let me ask you this.  Strike that.
24        Would you have paid for the second

Page 87

1  charge with the same credit card?
2    A    If it was the same time frame, yes.
3    Q    When did you -- strike that.
4        You made the purchase on August 24th.
5  When did you download the software?
6    A    Same day.
7    Q    Tell me what happened after you
8  downloaded the software with respect to the
9  performance of your laptop?
10    A    It ran another full scan again, another
11  scan, and it came back with a lot of flashing,
12  crackle lights and all kinds of things.  Turned it
13  on, ran it.  Went away, came back the next morning,
14  turned on the computer and the computer wasn't
15  running any better.  It was running another scan.
16  That scan came up saying same, critical, must do
17  this now, flashing lights.  Ran it again, nothing
18  improved.
19    Q    Was it worse or better or the same?
20    A    Worse.
21    Q    How was it worse?
22    A    It was not -- it was taking for long --
23  the little icon was just like rolling and rolling
24  and rolling, the time clock; never did boot back up

Page 88

1  a lot of times.
2    Q    This would have been noticed the next
3  day?
4    A    Yes.
5    Q    So what did you do about that?
6    A    Really not much.  I think I took off
7  after that and traveled and left the computer in my
8  office.
9    Q    Where did you travel to?
10    A    China.
11    Q    For what, business or pleasure?
12    MS. BOOTH:  Objection; relevance.
13        You can answer.
14    THE WITNESS:  I never have just business
15  trips.
16    By Mr. Borcia:
17    Q    So it was both pleasure and business?
18    A    Always.
19    Q    What part of China?
20    A    Beijing, Shanghai.
21    MS. BOOTH:  I will have a standing objection
22  for these questions based on relevance.
23    By Mr. Borcia:
24    Q    Who did you go with?

Page 89

1    A    I travel by myself.
2    Q    How long were you gone?
3    A    A month.
4    Q    During that time the laptop was at your
5  house?
6    A    It would have been in the office.
7    Q    Did you obtain a license to use the
8  SpeedyPC Pro software?
9    A    I did.
10    Q    How did you obtain that?
11    A    Through the purchase of the software.
12    Q    Did you get it in the mail or how did
13  you obtain it?
14    A    I don't recall.
15    Q    When you came back then from China, what
16  did you do with your laptop?
17    A    Well, obviously the first thing I did
18  was turn it on, come back and have the same
19  critical errors.  So then I called Speedy Pro and
20  asked them to please uninstall, refund my money.
21    Q    Did they do that?
22    A    No.
23    Q    What happened?
24    A    The reply came back to me that basically

23 (Pages 86 to 89)

CONFIDENTIAL