Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| ARCHIE BEATON, Individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) |
| vs. | ) No. 1:13-CV-08389 ) |
| SPEEDYPC SOFTWARE, a British Columbia company, | ) ) |
| Defendant. | ) |

The deposition of CRAIG J. SNEAD, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Ronda L. Jones, a notary public within and for the County of Cook, State of Illinois, at 350 North LaSalle Street, Chicago, Illinois, on the 24th day of August, 2016, at the hour of 9:14 a.m.

Reported by: Ronda L. Jones, CSR, RPR

License No.: 084-002728


EXHIBIT C

CRAIG J. SNEAD

Page 30

1  A. No.
2  Q. Have you reviewed any depositions in the case?
3  A. Will you repeat?
4  Q. Sure. Have you reviewed any deposition transcripts
5  in this case?
6  A. No.
7  Q. Did you ever look at a version of SpeedyPC 3.1.3?
8  A. Not in depth.
9  Q. When you said earlier the version of the software
10 you had was 3.0.0, how did you determine the version number?
11 A. Based on the "about" screen in the software.
12 Q. In preparing your report did you refer to any other
13 materials outside of the complaint, the source code and a
14 copy of the software?
15 A. There are references in my report.
16 Q. Outside of those?
17 A. No.
18 MR. BORCIA: Mark this as Exhibit 1, please.
19         (Whereupon, Snead Deposition
20         Exhibit No. 1 was marked for
21         identification.)
22 BY MR. BORCIA:
23 Q. Showing you Exhibit No. 1, is that a copy of the
24 complaint that you received?

Page 31

1  A. I'm sorry. Was that a question?
2  Q. Yes.
3  MS. BOOTH: You can take time to review it.
4  THE WITNESS: Yes, this looks like the complaint.
5  BY MR. BORCIA:
6  Q. Go to Paragraph 31. It states there, "Through his
7  attorneys plaintiff has engaged a computer forensic expert to
8  examine SpeedyPC Pro." Do you see that?
9  A. Yes.
10 Q. Is that you?
11 A. No.
12 Q. Do you know who that is?
13 A. No.
14 Q. Did you ever ask Edelson who that person was?
15 MS. BOOTH: Objection to the extent it calls for
16 communications between attorney and expert. I instruct you
17 not to answer that.
18 BY MR. BORCIA:
19 Q. And it says here, "The results of this
20 investigation." Do you see that?
21 A. Yes.
22 Q. Did you receive any results of the investigation
23 done by plaintiff's computer forensic expert?
24 A. No.

Page 32

1  Q. Are you a computer forensic expert?
2  A. No.
3  Q. Have you ever looked at the plaintiff's computer in
4  this case?
5  A. No.
6  Q. Have you ever looked at an image of the plaintiff's
7  computer?
8  A. No.
9  Q. Have you ever spoken with the plaintiff?
10 A. No.
11 Q. Have you ever read the plaintiff's deposition
12 transcript?
13 MS. BOOTH: Objection, asked and answered.
14 MR. BORCIA: No, it wasn't asked and answered.
15 MS. BOOTH: You asked him if he read any deposition
16 transcripts.
17 MR. BORCIA: Yes, and I'm allowed to ask more specific
18 questions. So it wasn't the same question. It wasn't asked
19 and answered, and your objection's improper.
20 MS. BOOTH: You can answer the question.
21 THE WITNESS: No.
22 BY MR. BORCIA:
23 Q. Have you ever seen the plaintiff's computer or an
24 image of his computer?

Page 33

1  A. No.
2  Q. What is your definition of a computer forensics
3  expert?
4  A. A computer forensics expert is an expert who can
5  examine a PC and run applications and view the low-level
6  information that an application in a computer stores to form
7  an opinion, I assume, on what is happening on a particular
8  system.
9  MR. BORCIA: This is No. 2.
10         (Whereupon, Snead Deposition
11         Exhibit No. 2 was marked for
12         identification.)
13 BY MR. BORCIA:
14 Q. Showing you Exhibit 2, Mr. Snead, is that your
15 report you issued in this case?
16 MS. BOOTH: You can take time to review it. Jim, this
17 one has different page numbers than the one that I have.
18 MR. BORCIA: I'm sorry?
19 MS. BOOTH: Off the record.
20 MR. BORCIA: Sure.
21         (Discussion off the record.)
22 BY MR. BORCIA:
23 Q. Beyond the page number issue, this is your report
24 correct? Sir, is that correct?

9 (Pages 30 to 33)

Page 34

1  A. I'm not sure which one I should use.
2  MR. BORCIA: If you want to use --
3  MS. BOOTH: The one he just gave you which is the
4  exhibit.
5  THE WITNESS: Yes.
6  BY MR. BORCIA:
7  Q. And that's your report, correct, sir?
8  A. Correct.
9  Q. Tell me what steps you took to prepare your report
10 and your opinions in the case?
11 A. I created a system to hold the source code and
12 installed a version of SpeedyPC. I copied the source code to
13 that system. I installed SpeedyPC on that system. I ran
14 SpeedyPC, and from there I reviewed the source code based on
15 what I was seeing on the UI.
16 Q. When you said you created a system, what kind of a
17 system was that?
18 A. A Windows 8 system.
19 Q. So were you using a computer for that?
20 A. A virtual machine.
21 Q. And when did you do that?
22 A. May.
23 Q. You used the term "UI." What was that?
24 A. User interface.

Page 35

1  Q. And you did this in your office at RAW?
2  A. In my office, yes.
3  Q. How long did that process take?
4  A. I analyzed the code for 22 hours approximately.
5  Q. How did you review the source code?
6  A. I used Visual Studio.
7  Q. What is Visual Studio?
8  A. It's Microsoft's version of a development
9  environment. It allows me to look at source code.
10 Q. Did you already have that in place in terms of the
11 Microsoft Visual Studio?
12 A. I downloaded and installed it on the new system.
13 Q. Did you review all the source code?
14 A. No.
15 Q. What part of the source code did you not review?
16 A. I only reviewed the scan and reporting/ratings
17 functionality of the source code.
18 Q. Why did you not review all of it?
19 A. Because it was out of scope and to save time.
20 Q. How long did it take for you to prepare your
21 report?
22 A. Like 11 hours total.
23 Q. When was your report prepared?
24 A. In June.

Page 36

1  Q. You said earlier that you only reviewed part of the
2  source code because it was -- the other part was out of
3  scope, you said.
4  A. Correct.
5  Q. And how is the scope defined?
6  A. It's defined by what I read in the complaint.
7  Q. And what parts of the complaint defined that scope
8  for you?
9  A. From what I understand the part of the complaint
10 where the software attempts to scan and identify errors,
11 related errors and items related to performance, part of that
12 complaint or -- seemed to be the place where my opinion was
13 needed.
14 Q. Why did you make that decision?
15 A. Because that's what I read and understood in the
16 complaint.
17 MS. BOOTH: Jim, if we're going to get into the
18 substance of the actual report, I'd request we take a break
19 right now.
20 MR. BORCIA: Sure.
21         (Recess taken.)
22 BY MR. BORCIA:
23 Q. Sir, if you could turn to Paragraph 14 of the
24 report and if you can look at the -- there's a second

Page 37

1  sentence there that says, "The efficacy of the purported
2  fixes are beyond the scope of this report." Do you see that?
3  A. Yes.
4  Q. And why did you feel that the efficacy of the fixes
5  were beyond the scope of the report?
6  A. Because the fixes happened after the scan and
7  rating of the PC.
8  Q. And was it based on your reading of the complaint
9  that you believe that the efficacy of the fixes was not part
10 of the complaint?
11 A. I believe they were out of my scope.
12 Q. Is there anything in the report that you want to
13 change or revise?
14 MS. BOOTH: You mean currently?
15 MR. BORCIA: Yes.
16 THE WITNESS: Not that I know of.
17 BY MR. BORCIA:
18 Q. Were there any false trails or approaches that you
19 went down in terms of your work in the case?
20 MS. BOOTH: Objection to the extent it calls for drafts,
21 but you can answer besides that.
22 THE WITNESS: Not that I remember.
23 BY MR. BORCIA:
24 Q. Did anyone assist you in preparing the report?

Page 42

1 Analysis includes code review.
2   Q.  And you began preparing the report on June 14th?
3   A.  Yes.
4   Q.  Did you prepare drafts of the report?
5   A.  Yes.
6   Q.  How many drafts did you prepare?
7     MS. BOOTH: Objection. That is also covered by Rule 26,
8  I believe it's (b)(4), just to the extent you're going to ask
9  for drafts, but you can talk about drafts.
10 BY MR. BORCIA:
11  Q.  You can answer.
12  A.  I don't recall.
13  Q.  Did you send drafts to counsel?
14  A.  Yes.
15  Q.  Do you know how many drafts you sent to counsel?
16  A.  I don't recall.
17  Q.  Who did you send the drafts to?
18    MS. BOOTH: Objection based on Rule 26(b)(4) both (b)
19 and (c).
20    MR. BORCIA: Are you instructing?
21    MS. BOOTH: I'm just reviewing the rule right now.
22 Sorry. Can you repeat the question?
23          (Record read as requested.)
24    MS. BOOTH: You can answer.

Page 43

1    THE WITNESS: Amir.
2 BY MR. BORCIA:
3   Q.  When you said that you ran the software, did you
4  have some kind of a license key to run the software?
5   A.  No.
6   Q.  So you were able to run the software without the
7  license key?
8   A.  I ran what I assumed to be the free version of
9  SpeedyPC.
10  Q.  So that would be what you refer to in the report as
11 the unlicensed version?
12  A.  Yes.
13  Q.  So you didn't run the version you would use to pay
14 for. Is that correct?
15  A.  Correct.
16  Q.  And you said you ran it on a virtual machine.
17 Is that right?
18  A.  Yes.
19  Q.  Can you describe to me what a virtual machine is?
20  A.  A virtual machine is a PC that runs on a host
21 system. It allows someone to encapsulate an operating system
22 and run it just like it's another computer.
23  Q.  You said earlier that you assumed that what you
24 received was the free version. Is that right?

Page 44

1   A   I believe it was the free version.
2   Q.  What do you base that assumption on?
3   A.  Based on the fact that when you try to fix it, it
4  prompts you to purchase software.
5   Q.  And what were the features of the virtual machine
6  that you used?
7   A.  I don't understand that question.
8   Q.  You said the version machine was a PC. Is that
9  right?
10  A.  Windows 8 PC.
11  Q.  Was it new?
12  A.  Yes.
13  Q.  And what were the features of the software that you
14 used?
15  A.  I used the scanning UI.
16  Q.  Any others?
17  A.  The scanning UI results and a ratings UI being
18 shown to me as well.
19  Q.  And do you recall what the results of the scanning
20 was and the ratings on the machine you used?
21  A.  I believe it's in my report.
22  Q.  Can you show me where in your report that is?
23  A.  Sure. Page 6, Figure 1.
24  Q.  And how many times did you run the scan?

Page 45

1   A.  I don't know.
2   Q.  So the graphics that are -- the figures that are in
3  your report, those all came from your virtual machine?
4   A   Yes.
5   Q.  What are the differences between a physical
6  computer and a virtual computer?
7   A.  The difference is a physical computer runs the
8  operating system on the hardware that it's running on. A
9  virtual machine runs on top of a host system. It uses the
10 resources of a host system.
11  Q.  And what was the host system used here?
12  A.  Windows 8 Professional, I believe.
13  Q.  Why did you use that system?
14  A.  Because that's the system that I use on a daily
15 basis.
16  Q.  Did you use a tool to review the source code?
17  A.  I used Visual Studio.
18  Q.  And do you know what type of operating system in
19 this case the plaintiff was using?
20  A.  No.
21  Q.  Did you read that in the complaint?
22  A.  It might be in there, but I don't recall.
23  Q.  Was there a version of Visual Studio you used?
24  A.  I used Visual Studio 2012 Express for Desktop.

Page 46

1  Q. You mention in your report -- go to Paragraph 3.
2  A. Okay.
3  Q. Let's just go to Paragraph 2. You mention that
4  your report is based upon your training. Do you see that?
5  A. Yes.
6  Q. What type of training is your report based upon?
7  A. On-the-job training.
8  Q. Where?
9  A. SpringFin, Sylint.
10 Q. I see in Paragraph 3 you have more than seven years
11 of experience developing websites. Is that right?
12 A. Websites and software.
13 Q. What websites did you develop?
14 A. There are too many to name here.
15 Q. Did you develop the website at RAW?
16 A. Yes.
17 Q. What software have you developed?
18 A. Hundreds of utilities.
19 Q. Can you give me some examples?
20 A. Data parsing utilities, computer forensics
21 utilities, electronic data interchange utilities.
22 Q. Have you developed any utility software similar to
23 SpeedyPC Pro?
24 A. No.

Page 47

1  Q. Have you developed any computer -- I'm sorry.
2  Strike that.
3     Have you developed any consumer software?
4  A. Yes.
5  Q. What type?
6  A. Computer forensics.
7  Q. Any others?
8  A. No.
9  Q. What was the computer forensics software that you
10 developed? What was it called?
11 A. Preservation Kit.
12 Q. Is that being sold today?
13 A. It's been released but not sold.
14 Q. Who is that for?
15 A  Anyone who can use it.
16 Q. I mean who's going to be selling that software?
17 A. The LLC that's was formed to sell Preservation Kit.
18 Q. What's the LLC called?
19 A. Digital Preservation Project, LLC.
20 Q. Where are they located?
21 A. Either Florida or Texas. I don't know which -- I
22 think it's Florida.
23 Q. Who was the person you worked for in that?
24 A. Myself.

Page 48

1  Q. And was that while you were working for RAW you
2  developed that?
3  A. Yes.
4  Q. So are their billings from RAW to that LLC for your
5  work?
6  A  No.
7  Q. How can we get a copy of that software? Is it
8  available?
9  A. Purchase it.
10 Q. How can we purchase it? Where?
11 A. PreservationKit.com.
12 Q. When was it released?
13 A. I don't know exactly. A couple months ago.
14 Q. You mentioned you developed data parsing software.
15 Is that right?
16 A. Several times, yes.
17 Q. What type of language did you use for those?
18 A. Many different languages.
19 Q. Can you tell me what different ones you used?
20 A. C++, C sharp.
21 Q. Any others?
22 A. DB.net.
23 Q. Did you use a tool to develop your website at RAW?
24 A. Yes.

Page 49

1  Q. What tool did you use?
2  A. Visual Studio.
3  Q. In Paragraph 4 of your report you state, "RAW
4  specializes in information security assessments." Do you see
5  that?
6  A. Correct.
7  Q. What does that refer to?
8  A. It refers to when we assist small businesses in
9  assessing their current cyber security risks and help them
10 mitigate those risks.
11 Q. Who are some of your customers that you do that
12 for?
13 A. I don't know that I can say that.
14 Q. Why?
15 A. We have nondisclosure agreements with those
16 customers.
17 Q. So you're not willing to give that information?
18 A. Not at this time until I'm able to review that.
19 Q. The next paragraph, Paragraph 5 you say, "My
20 opinions summarized below, which I expect to provide further
21 testimony about ..." I just want to make sure I understand,.
22 you're saying that all your opinions are in your report.
23 Is that correct?
24 A. Yes.

13 (Pages 46 to 49)

Page 66

1  asking about junk files that the SpeedyPC software detected.
2  Is that right?
3     A.  Yes.
4     Q.  Is there some junk files that SpeedyPC software
5  will not detect?
6     A.  Yes.
7     Q.  What type of junk files would it not detect?
8     A.  There are too many to answer. There are many, many
9  types that it would not detect.
10    Q.  What type of junk files will it detect?
11    A.  It detects the list that is on my report.
12    Q.  Can you point me to that?
13    A.  The extensions are on Figure 6, Page 20.
14    Q.  And can the person using the software select other
15 types of junk files to detect?
16    A.  I don't know.
17    Q.  Why don't you know that?
18    A.  Beyond my scope. I was looking at default
19 functionality for SpeedyPC.
20    Q.  So the complaint that you reviewed that the
21 plaintiff used in this case was based upon his use of the
22 unlicensed and licensed versions of the software. Is that
23 right?
24    A.  Correct.

Page 67

1     Q.  And so why didn't you analyze the licensed version
2  of the software?
3     MS. BOOTH: Objection, calls for a legal conclusion.
4  You can answer to the best of your ability.
5     THE WITNESS: As I stated before, before you can fix a
6  PC you have to scan the PC. I focused on the scanning
7  because that is where the complaint seemed to lie.
8  BY MR. BORCIA:
9     Q.  And did the attorneys you work with, did they have
10 any input into that decision?
11    MS. BOOTH: Objection, that calls for communications
12 between his attorneys and the expert. You cannot talk about
13 the substance of our communications unless it talks about
14 facts, data or assumptions that could have been provided to
15 you.
16 BY MR. BORCIA:
17    Q.  So the Figure 1 on Page 6 of your report, is that a
18 snapshot of what resulted on your virtual machine after you
19 ran the scan?
20    A.  Yes.
21    Q.  So in Paragraph 10 you state -- strike that.
22        The same goes for Figure 2. Is that right?
23    A.  Yes.
24    Q.  And Figure 3 as well?

Page 68

1     A.  Yes.
2     Q.  In Paragraph 10 you state, "Upon completion of a
3  diagnostic scan using either the licensed or unlicensed
4  version of the software, the software determines the overall
5  performance rating of a computer." Do you see that?
6     A.  Yes.
7     Q.  That's based upon your review of the source code?
8     A.  Correct.
9     Q.  And then you comment there it sets it to the lowest
10 system rating.
11    A.  Where do you see --
12    Q.  It's in Paragraph 10.
13    A.  Yes.
14    Q.  You believe that's significant for the case?
15    MS. BOOTH: Just for clarification, are you talking
16 about the lowest system rating generally or the lowest system
17 rating of the modules?
18    MR. BORCIA: I'm talking here about the lowest system
19 rating on the modules.
20    MS. BOOTH: Okay.
21    THE WITNESS: Yes.
22 BY MR. BORCIA:
23    Q.  Why is that significant?
24    A.  Because all the other -- you have one module that

Page 69

1  comes back as system rating low. All of your other modules
2  come back as system rating high. The user will be shown that
3  their system rating is low, not a mix of the various ratings.
4     Q.  So you believe it should be mixed?
5     A.  I believe that that's significant.
6     Q.  Why?
7     A.  Because I don't believe it represents an accurate
8  picture of what came back in the scan.
9     Q.  So how would you fix that?
10    A.  I would probably come up with an algorithm that
11 weights each of the results.
12    Q.  How would you weight the results?
13    MS. BOOTH: Objection, it's outside the scope of the
14 report, but you can answer to the best of your ability.
15    THE WITNESS: I would have to determine that based on
16 research and analysis before I designed and developed that
17 algorithm.
18 BY MR. BORCIA:
19    Q.  And you haven't done that, correct?
20    A.  Correct.
21    Q.  And are all the modules equal in terms of their
22 significance?
23    MS. BOOTH: Objection, I'm not sure whether -- to the
24 form. I'm not sure whether you're asking about in his mind

18 (Pages 66 to 69)

Page 82

1 Sentence 4 of potential malware. The software detects actual
2 malware, not potential malware, correct?
3    A. Incorrect.
4    Q. Okay. Are you saying the software detects
5 potential malware?
6    A. Yes.
7    Q. And labels it as malware?
8    A. Potentially.
9    Q. What's your support for that?
10    A. Because it has a user define app setting, and that
11 comes back -- it could be anything. I could write something,
12 and it could potentially detect that as malware, and so it
13 might identify that as malware, and it may or may not be
14 malware.
15    Q. So you're saying you could write something that's
16 not malware, and the system could detect it as malware?
17    A. Yes.
18    Q. What's the basis for that statement?
19    A. Because I've had that happen several times on
20 several different antivirus and malware scanning
21 applications.
22    Q. In what context?
23    A. In the context of creating those and running them
24 on production systems, and every once in a while something

Page 83

1 will find that your software is malware based on whether it's
2 signed or unsigned. Then it will flag it as malware, and it
3 won't allow it to run, and then you have to go in and unflag
4 it as malware. And so I use the term "potential malware" to
5 identify the fact that this malware scanner is identifying
6 potential malware.
7    Q. But the examples you've given, those weren't for
8 SpeedyPC Pro, correct?
9    A. Correct.
10    MR. BORCIA: Want to take a break? You want to break
11 for lunch?
12    MS. BOOTH: Sure.
13       (Whereupon, a recess was taken
14       at 12:10 p.m. and resumed at
15       1:23 p.m.)
16 BY MR. BORCIA:
17    Q. Mr. Snead, turn to Paragraph 14 of Exhibit 2, your
18 report.
19    A. Okay.
20    Q. You mention here that the software requires the
21 user to purchase a license. You see that?
22    A. To fix the problems.
23    Q. Right. So you're not required to purchase the
24 license just if you want to fix the problems. You've got to

Page 84

1 purchase the software. Is that right?
2    A. Say that again.
3    Q. A consumer is not required to purchase the
4 software. Just if you want to fix the problems then you're
5 required to purchase it. Is that right?
6    A. That is correct.
7    Q. Now, in Paragraph 15 you have a summary of the
8 ratings for each module starting with the system problems in
9 15. Is that right?
10    A. Yes.
11    Q. What is your purpose in noting this in your report?
12    A. It's to explain how the software determines the
13 damage level of a particular module.
14    Q. And you got this from the source code?
15    A. Yes.
16    Q. Do you have any criticisms of the way the system
17 reports the problems?
18    A. For which module?
19    Q. Let's start with 15(a), the System Problems module.
20    A. My only criticism is the numbers seem arbitrary to
21 me.
22    Q. So how would you make the numbers not arbitrary?
23    A. I'd have to research that.
24    Q. You have not done that, correct?

Page 85

1    A. Correct.
2    Q. And why do you feel the numbers seem arbitrary?
3 What about them makes you feel that way?
4    A. Because I've never seen any standards or anything
5 that say that if you have 19 system problems then your damage
6 level in your computer is at a minor level of damage.
7    Q. Are there any industry standards along those lines?
8    A. I don't know.
9    Q. You've not researched that?
10    A. No.
11    Q. And you're not giving the opinion that any of the
12 counts listed are not accurate?
13    A. The counts listed are what is returned by the
14 particular module that was scanned.
15    Q. You're not saying that those returns are not
16 accurate?
17    A. Correct.
18    Q. Let's go to Paragraph 16, you discuss the scanning
19 for 16(b), Malware. Do you see that?
20    A. (b) Malware, yes.
21    Q. And why is this listed in your report?
22    A. The same reason as the systems problems. I wanted
23 to go through each module and show how the system categorizes
24 and identifies the damage level of each module, and it will

Page 126

1  in the industry to measure against SpeedyPC Pro?
2      A.  No.
3      Q.  Is it common for software to not contain any
4  descriptive comments?
5      MS. BOOTH:  Objection, form.  You can answer.
6      THE WITNESS:  Say that again.  To not contain?
7  BY MR. BORCIA:
8      Q.  Yes.
9      A.  Is it common for software to not contain
10 descriptive comments?
11     Q.  Right.
12     A.  I've seen it both ways.  I've seen really
13 descriptive comments, and I've seen nothing.
14     Q.  You understand that the software's audience was
15 geared towards consumers?
16     A.  Yes.
17     Q.  And is it your experience that consumers have the
18 capacity to consider a complex list of problems and potential
19 nuances between them?
20     MS. BOOTH:  Objection, form.  You can answer if you can.
21     THE WITNESS:  I don't know.
22 BY MR. BORCIA:
23     Q.  Your criticism of the software -- one criticism is
24 it doesn't describe for the consumer the severity of the

Page 127

1  problem?
2      A.  I believe that my criticism is that it doesn't use
3  everything that's available to it to accurately associate a
4  damage level based on the information that it receives from
5  whatever scanning engine that it is.
6      Q.  And is it fair to say that some consumers may be
7  perfectly satisfied with the way SpeedyPC reports?
8      MS. BOOTH:  Objection, speculation.
9      THE WITNESS:  I don't know.
10 BY MR. BORCIA:
11     Q.  Is it fair to say that not all registry problems
12 are innocuous?
13     A.  Yeah, it's fair to say that.
14     Q.  Go to Paragraph 54 and 55 of your report.
15     A.  Okay.
16     Q.  Are you reporting here hypotheticals or did you
17 actually conduct this analysis?
18     MS. BOOTH:  You can review it as well before you answer.
19     THE WITNESS:  This situation is based on my review of
20 the software and how the software works and what the software
21 will find or attempt to find on a user's PC.
22 BY MR. BORCIA:
23     Q.  So it's a hypothetical?
24     A.  Yeah, it's a hypothetical, but it's based on the

Page 128

1  code that I read.
2      Q.  And based upon your methodology utilizing the code
3  that you read?
4      A.  Correct.
5      Q.  If I asked you to define what you mean by the term
6  "performance of a computer," how would you define that?
7      A.  Performance of a computer?
8      Q.  Yes.
9      A.  I would say that it's the speed and usefulness of a
10 system that a user is using.
11     Q.  Is it possible for a single registry item to have
12 an effect on a computer's performance?
13     A.  I'd have to speculate, but I guess it would be
14 possible.
15     Q.  When you analyzed the code, did you find fixes --
16 strike that.
17         When you analyzed the code, did you find in
18 the code fixes for what SpeedyPC Pro considered to be
19 registry related problems?
20     MS. BOOTH:  Objection, form.  You can answer.
21     THE WITNESS:  I wasn't looking for fixes.  I was looking
22 for functionality.
23 BY MR. BORCIA:
24     Q.  And when you analyzed the code, did you find

Page 129

1  anything in the code where it provided for SpeedyPC Pro to
2  remove what SpeedyPC Pro considered to be junk related files?
3      A.  That question is not clear to me.  Can you please
4  rephrase?
5      Q.  Sure.  When you analyzed the code for the software,
6  did you find anything in the code that provided for the
7  software to remove junk related items?
8      A.  It's still not clear.  I don't understand the
9  question.
10     Q.  When you analyzed the code, did you see anything in
11 the code related to repairing junk files?
12     A.  I didn't look at the repairing functionality.  I
13 looked at the scanning functionality.
14     Q.  And when you reviewed the code, did you see in the
15 code where it provided for the software to remove privacy
16 files?
17     A.  Again, I didn't look at the removal of the privacy
18 items.  I only looked at the discovery of privacy items.
19     Q.  And when you looked at the code, did you see
20 anything in the code that related to the ability of the
21 software to defragment the hard drive?
22     A.  No.  It was out of scope.
23     MR. BORCIA:  Can we take five, Courtney?
24     MS. BOOTH:  Sure.