IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARCHIE BEATON, individually and on behalf of others similarly situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SPEEDYPC SOFTWARE, )<br>)<br>Defendant. ) | No. 13-cv-08389<br><br>Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

In this certified class action, Lead Plaintiff Archie Beaton claims that Defendant SpeedyPC Software ("SpeedyPC"),[1] a Canadian computer software company, engaged in fraudulent and deceptive marketing practices for SpeedyPC Pro ("Software"), a software product that supposedly diagnoses and repairs various computer errors, optimizes computer performance, and protects computers from malware. Beaton asserts claims on behalf of himself and the Class for breach of the implied warranties of fitness for a particular purpose and merchantability provided by British Columbia's Sale of Goods Act ("SGA"), R.S.B.C. 1996, c 410 (Can.), and claims on behalf of himself and the Subclass for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.* Now before the Court is SpeedyPC's motion for summary judgment. (Dkt No. 333.) For the following reasons, SpeedyPC's motion is granted in part and denied in part.

---

[1] SpeedyPC Software was a trade name owned and used by ParetoLogic, Inc. (Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 3, Dkt. No. 340.)

**BACKGROUND**

For purposes of summary judgment, the Court views the evidence in the light most favorable to Beaton as the nonmoving party and draws all reasonable inferences in his favor. *Weber v. Univs. Rsch. Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). Except where otherwise noted, the following facts are undisputed.

On August 24, 2012, Beaton, a resident of Illinois, purchased and downloaded SpeedyPC's Software to his computer. (Pl.'s Resp. to Def.'s Statement of Material Facts ("PRDSF") ¶ 10, Dkt. No. 340; Def.'s Resp. to Pl.'s Statement of Additional Material Facts ("DRPSAF") ¶ 12, Dkt. No. 344.) Advertisements for the product stated that it increased computer speed and performance, removed harmful computer errors, and protected users' privacy and security. (DRPSAF ¶ 1.) The Software purported to "Fix Common Errors," "Boost PC Speed," "Clean Up Clutter," and "Fix All" problems. (*Id.* ¶ 2.) Upon viewing these advertisements, Beaton purchased the Software online. (*Id.* ¶¶ 10–11.)

Before he installed the Software, however, SpeedyPC required that Beaton accept all terms of its End User License Agreement ("EULA"). (PRDSF ¶¶ 11, 13.) The EULA included the following provisions:

> Subject to the terms and conditions of this Agreement, SpeedyPC Software grants to you a limited, non-exclusive, non-transferable license to use or evaluate the Software . . . . You have purchased a license to use the Software. . . . This Agreement is a legally binding agreement between SpeedyPC Software and the user(s) of this Software. . . . This Agreement shall be governed exclusively by the laws of the Province of British Columbia and the laws of Canada applicable therein . . . .

(*Id.* ¶ 14.) Beaton accepted the EULA by clicking an "I Agree" button that appeared on his computer screen (*id.* ¶ 13); and he received the Software electronically by downloading it from the internet along with a license, rather than receiving a physical copy. (*Id.* ¶¶ 7, 10.)

2

Beaton claims that he purchased the Software from SafeCart, an "intermediary" that marketed the Software and collected payment on behalf of SpeedyPC. (DRPSAF ¶¶ 18, 25.) SpeedyPC characterizes its relationship with SafeCart somewhat differently—according to Speedy PC, it made the Software available to independent resellers via third-party platforms, including RevenueWire doing business as SafeCart. (PRDSF ¶¶ 8, 10.) SpeedyPC thus claims that Beaton purchased his license for the Software from SafeCart, not SpeedyPC. (*Id.* ¶ 10.) Beaton, on the other hand, claims that SafeCart was "merely a shopping cart that RevenueWire set up for SpeedyPC to use to sell its software." (*Id.* ¶ 10.) Indeed, after his purchase, Beaton's credit card statement showed a charge from "SafeCart.com*Speedypc" for the purchase of the Software. (DRPSAF ¶ 24.) SpeedyPC was also solely responsible for directly providing Beaton and other licensees with a license key. (*Id.* ¶ 22.) As described by SpeedyPC's Chief Executive Officer during his deposition, "[t]here's no other way for [SpeedyPC] to get [licensees] a license key," which is the only way to activate the Software. (*Id.* ¶¶ 21–22.)

Beaton claims that after he purchased the Software, he found that it did not function as advertised. (*Id.* ¶ 13.) Meanwhile, SpeedyPC denies having made any deceptive advertisements. (*Id.*) Given his issues with the product, in February 2013, Beaton requested a refund from SpeedyPC. (PRDSF ¶ 18.) SpeedyPC rejected the refund request, stating that it was untimely. (*Id.*)

Beaton subsequently filed the present class action against SpeedyPC, alleging that its false and misleading marketing induced him and other similarly situated persons to purchase the Software. After extensive discovery and motion practice, the Court certified the following Class for purposes of Beaton's claims for breaches of the implied warranties of fitness for a particular purpose and merchantability under the SGA: "[a]ll individuals living in the United States who downloaded a free trial of SpeedyPC Pro and thereafter purchased the full version between

3

October 28, 2011 and November 21, 2014." (PRDSF ¶¶ 19, 22.) The Court also certified a Subclass consisting of "all [C]lass members who reside in Illinois" for purposes of Beaton's claims for fraudulent misrepresentation under the ICFA. (*Id.* ¶¶ 21, 23.)

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Here, SpeedyPC seeks summary judgment on both the claims under the SGA for breach of the implied warranties of fitness for a particular purpose and merchantability and the claims under the ICFA.

### I. Implied Warranties under the SGA

The SGA is "designed to protect a purchaser of goods and sets out sellers' obligations" attendant to a sale of goods. *Conners v. McMillan*, 2020 BCPC 230, para. 58 (Can.). Where a contract is silent, the SGA implies warranties to sales of goods under certain conditions. *Bhangu v. Honda Can. Inc.*, 2021 BCSC 794, para. 64 (Can.). Beaton asserts claims for breach of two implied warranties under the SGA: the implied warranty of fitness for a particular purchase and the implied warranty of merchantability. An implied warranty of fitness for a particular purpose exists if a buyer makes known to the seller the particular purpose for purchasing the goods, the buyer relies on the seller's skill or judgment, and the seller supplies the goods in the course of its business. R.S.B.C. 1996, c 410, § 18(a) (Can.). Meanwhile, an implied warranty of merchantability exists if a buyer purchases goods from a seller whose business deals in those goods. *Id.* § 18(b).

4

In seeking summary judgment as to the implied warranty claims, SpeedyPC raises two arguments: (1) that the SGA does not apply to purchases of the Software because the license agreement embodied in the EULA does not provide for the sale of "goods" within the meaning of the SGA; and (2) that there is no privity of contract between Beaton and the Class members, on the one hand, and SpeedyPC, on the other hand, such that SpeedyPC can be considered the seller of the Software. The Court begins with the latter argument.

### A. Privity and Seller Requirements

The SGA provides that if there is a breach of warranty by the "seller," the "buyer may . . . maintain an action against the seller for damages for the breach of warranty." R.S.B.C. 1996, c 410, § 6 (Can.). Under Canadian law, a party must be in privity with the other party to enforce a contract. *Holmes v. United Furniture Warehouse Ltd. P'ship*, 2012 BCCA 227, para. 10 (Can.) ("In general, the doctrine of privity of contract prevents a person who is not a party to the contract from enforcing the contract so as to take a benefit from it."). And the same holds true for claims brought pursuant to the SGA. *Mann-Tattersall (Litig. Guardian of) v. Hamilton (City)*, 2000 CarswellOnt 5002, para. 31 (Can. O.S.C.J.) (WL) ("A party cannot advance a claim for breach of any of the implied warranties provided for in the Sale of Goods Act against a party with whom it has no privity of contract."). Accordingly, "[a] party cannot advance a claim for breach of any of the implied warranties provided for in the [SGA] against a party with whom it has no privity of contract." *Bhangu*, 2021 BCSC 794, para. 64.

SpeedyPC contends that the undisputed evidence establishes that it was not in privity of contract with Beaton or the other Class members. The Court disagrees. The EULA is sufficient to establish privity of contract between SpeedyPC and users who downloaded the Software. The terms and conditions of that agreement create a "legal relationship" between the parties,

5

*Haliburton Forest & Wildlife Rsrv. Ltd. v. Toromont Indus. Ltd.*, 2016 ONSC 3767, para. 102 (Can.), as demonstrated by the plain language of the document, which states: "[t]his Agreement is a legally binding agreement between SpeedyPC Software and the user(s) of this Software." (PRDSF ¶ 16.)

Nonetheless, SpeedyPC contends that it cannot be deemed the seller of the Software because Beaton and other Class members actually purchased the Software from SafeCart. According to SpeedyPC, SafeCart is an "independent reseller" (PRDSF ¶ 8), and thus SpeedyPC cannot be considered "a person who sells or agrees to sell goods" under the SGA. *See* R.S.B.C. 1996, c 410, § 1 (Can.). To support its argument, SpeedyPC points to the EULA, which states that individuals who purchase the Software from a "reseller, distributor, retailer, or any other third party" must request a refund directly from such party. (PRDSF ¶ 16.) SpeedyPC appears to find this provision noteworthy because it acknowledges that third parties may sell the Software to customers, and the EULA treats those purchases differently from purchase made directly from SpeedyPC.

But there is at least a disputed issue of fact as to whether SpeedyPC was the "seller" of the Software. For example, to complete a purchase, the customer must agree to the terms and conditions laid out in the EULA. (PRDSF ¶ 13.) And the EULA itself states that SpeedyPC "grants [the customer] a limited, non-exclusive, non-transferable license to use or evaluate the Software." (*Id.* ¶ 16.) Further, upon receiving a customer's email address, SpeedyPC sends the customer a license key, which enables the customer to use the Software. (DRPSAF ¶ 20.) Without the license key, the Software cannot operate. (*Id.* ¶¶ 21–22.) This highlights SpeedyPC's significant role in customer purchases. Moreover, "SafeCart.com*Speedypc" appears as the

vendor on customers' credit card statements. (*Id.* ¶ 24.) SpeedyPC's involvement throughout the sale appears to be commensurate with that of a seller.

Beaton also cites *Great West Van Conversions Inc. v. Langevin*, in which a British Columbia court interpreted the term "seller" as used in the SGA to include not only the entity that directly made the sale but also the manufacturer of the product. 2000 BCSC 1830, paras. 51–52 (Can.). In *Great West Van Conversions*, the court found that the manufacturer of a specially converted vehicle fell under the SGA's definition of a seller. 2000 BCSC 1830, para. 52. The plaintiff read the defendant manufacturer's brochures that attested to the vehicle's "quality craftsmanship." *Id.* The plaintiff then relied on those advertisements in making her purchase. *Id.* Given the "specific product with particular characteristics" at stake and the plaintiff's reliance on the manufacturer's advertisements, the court determined that the manufacturer was appropriately deemed a seller for purposes of the SGA. Similarly, Beaton has adduced evidence that he relied on SpeedyPC's advertisements claiming that the Software would "Fix Common Errors," "Boost PC Speed," "Clean Up Clutter," and "Fix All" problems. (DRPSAF ¶¶ 2, 10–11.) And while SpeedyPC's Software was not "specially" fitted, SpeedyPC knew precisely the needs of its customers: to "increase[] computer speed and performance, remove[] harmful computer errors, and protect[] users' privacy and security." (*Id.* ¶ 1.) The evidence of customers' "known needs" and Beaton's reliance on SpeedyPC's advertisements persuade the Court that SpeedyPC can be held accountable as a seller under the SGA, even if Beaton and other Class members purchased directly from Safe Cart.

In sum, the Court rejects SpeedyPC's argument that it cannot be held liable as the seller of the Software as a matter of law. Accordingly, summary judgment cannot be granted on that basis.

7

B.  The Software as "Goods" under the SGA

Next, SpeedyPC claims that the SGA does not apply to the transactions at issue because the license to use the Software that was purchased by Beaton and other Class members does not qualify as "goods" within the meaning of the statute.

To begin, under the terms of the EULA, it is undisputed that Beaton and the Class members purchased a license to use the Software for a limited period time, and not the Software itself. (PRDSF ¶ 14 ("Subject to the terms and conditions of this Agreement, SpeedyPC Software grants to you a limited, non-exclusive, non-transferable license to use or evaluate the Software.").) For the SGA to apply to those transactions, the Software license must fall under the Act's definition of "goods." R.S.B.C. 1996, c 410, § 1 (Can.).

Neither Beaton nor SpeedyPC has brought forward any case law regarding the treatment of software under the SGA or, more specifically, whether software licensed to users can qualify as goods. Thus, in considering whether the license to use the Software qualifies as "goods," the Court begins with the language of the statute. The British Columbia Supreme Court (the province's superior trial court) has previously explained the proper approach to statutory interpretation:

> We assume that the ordinary meaning [of a statute] is intended because this meaning is derived from conventions that are shared by the participants in the communication. In the case of statutes, ordinary meaning is a bridge connecting the minds of the proponents of the statute, the drafters, members of the legislature, the audience to be governed and the courts.

*Endeavour Devs. Ltd. v. Comox-Strathcona (Reg'l Dist.)*, 1995 CarswellBC 117, para. 22 (Can. B.C.S.C.) (WL). The term "goods" is defined in the SGA to include "all chattels personal, other than things in action and money." *Id.* Notably, Black's Law Dictionary defines a "chattel" as "movable or transferable property; personal property; esp., a physical object capable of manual

8

delivery and not the subject matter of real property." *Chattel*, Black's Law Dictionary (11th ed. 2019).

Given the definition of goods pursuant to the SGA—"all chattels personal," R.S.B.C. 1996, c. 410, § 1 (Can.)—and the common legal definition of chattel as "movable or transferable property; personal property," *Chattel*, Black's Law Dictionary (11th ed. 2019), the Court finds that the Software license that Beaton and the Class members purchased does not qualify as "goods" under the SGA. The ordinary meaning of the term references tangible objects, but the Software license is an intangible item, incapable of being physically moved or transferred. Though Beaton focuses on the term "include" in the SGA's definition of "goods" as rendering the categories listed in the definition as non-exhaustive, both categories that are listed describe tangible property. The Court finds the SGA's definition of "goods" to be unambiguous and that it does not cover the Software license purchased by Beaton and other Class members.

In arguing to the contrary, Beaton contends that under Canadian law, statutes "must be read in light of modern values and expectations" and "[c]ourts are not necessarily bound by the views and awards made in earlier times." *Tataryn v. Tataryn Est.*, [1994] 2 S.C.R. 807, para. 15 (Can.). Instead, Beaton urges, "[t]he search is for contemporary justice." *Id*. From that premise, Beaton argues that the term "includes" in the SGA's definition of goods ("goods includes . . . all chattels personal," R.S.B.C. 1996, c. 410, § 1 (Can.)) should be read broadly to include both tangible and intangible goods. But *Tataryn* involved Canada's statute regarding wills, which specifically allows courts to order an "adequate, just, and equitable" provision for a testator's wife, husband, or children if the will does not so provide. *Tataryn*, 2 S.C.R. 807, para. 9. The particular statute considered in *Tataryn* confers broad discretion on courts and expressly advises them to account for modern values and expectations; it does not provide that all statutes must be

read that way. *Id.* at para. 15 ("The language of the Wills Variation Act is very broad. . . . The generosity of the language suggests that the legislature was attempting to craft a formula which would permit the courts to make orders which are just in the specific circumstances and in light of contemporary standards.").

Unable to point to any SGA case law providing that software licenses are goods, Beaton notes that courts in the United States have found that "software . . . is a good that is covered by the [Uniform Commercial Code]." *Simulados Software, Ltd. v. Photon Infotech Priv., Ltd.*, 40 F. Supp. 3d 1191, 1199 (N.D. Cal. 2014), and references Canadian trademark law. Specifically, Beaton points out that SpeedyPC described the Software as a "good" for purposes of its trademark registration. (Pl.'s Statement of Additional Material Facts ("PSAMF"), Ex. 2-F, Dkt. No. 341-2.) Beaton further points to *Specialty Software Inc. v. Bewatec Kommunikationstechnik GmbH*, 2016 FC 223 (Can.), to show that Canadian courts have viewed software licenses as goods for purposes of the Trademarks Act, R.S.C. 1985, c T-13 (Can.). But the Trademarks Act also does not contain any definition for "goods." *Id.* Nor does *Specialty Software* provide any analysis of whether a software license is a good—instead, it assumes such to be the case. *See Specialty Software*, 2016 FC 223, para.13 ("The real goods were, and are, the licenses."). Without analyzing the SGA, or even a parallel definition of "goods," *Specialty Software* and Beaton's trademark law cases shed little light on the present dispute. On the other hand, SpeedyPC points to a copyright case under Canadian law, *Leuthold v. Canadian Broad.*, 2014 CAF 173 (Can.), in which the court found:

> A license [sic] agreement is not a sale of goods; no property in goods is transferred as a result of a license [sic] agreement. All that is conveyed is a right to use the property which is subject to the grantor's copyright in certain ways. Furthermore, an intangible such as an interest in copyright is not a good . . . .

*Id.* at para. 27.[2]

In the end, the Court concludes that SpeedyPC has the better argument with respect to the application of the SGA to the licenses to use the Software that form the basis for the present action. Accordingly, the Court grants summary judgment on the claims for breach of the implied warranties of fitness for a particular purpose and merchantability.

## II. ICFA Claims

SpeedyPC also seeks summary judgment on Beaton's and the Subclass's ICFA claims. The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (citations omitted). To establish the alleged violation of the IFCA, Beaton must prove: (1) a deceptive act or practice by SpeedyPC; (2) that the deceptive act or practice occurred in the course of conduct involving trade or commerce; (3) that SpeedyPC intended that Beaton and members of the Subclass rely on the deception; and (4) that actual damages were proximately caused by the deception. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).

SpeedyPC contends that it is entitled to summary judgment on the ICFA claims for two reasons. First, SpeedyPC claims that the choice-of-law provision in the EULA requires application of British Columbia law, not Illinois law. And second, SpeedyPC argues that the ICFA does not

---

[2] SpeedyPC also relies on English and Australian cases, which it contends British Columbia courts rely upon as persuasive authority. Each case cited by SpeedyPC interprets the court's own jurisdiction's equivalent of the SGA, with each offering an example of software not being considered a good. But *Canadian Council of Churches v. R.*, [1992] 1 S.C.R. 236 (Can.), the case SpeedyPC cites for the proposition that English and Australian cases carry persuasive authority for interpretation of Canadian statutes, does not go that far. The case involves an issue of standing andconsiders other common law jurisdictions' approaches to standing that "may be illuminating." *Id.* at para. 12. The court says nothing about the persuasive authority of international jurisdictions when interpreting Canadian statutes. *See id.*

11

apply to the subject transactions because the ICFA does not have extraterritorial effect and the transactions did not occur primarily and substantially in Illinois.

## A. Choice of Law

SpeedyPC first points to the choice-of-law provision in the EULA to show that only British Columbia law applies for purposes of claims based on Beaton's and the Subclass members' Software purchases. As Beaton points out, however, the Court previously addressed this very issue when it denied SpeedyPC's motion to dismiss based on the doctrine of *forum non conveniens*. (*See* June 5, 2015 Mem. Op. and Order, Dkt. No. 77.) At that time, the Court concluded that Illinois law governs Beaton's fraud-based tort claims. (*Id.* at 9 ("For the ICFA, fraudulent inducement, and unjust enrichment claims, the law of the state where the injury occurred applies unless another state has a more significant relationship to the occurrence and parties. . . . Here, the injury to Beaton occurred in Illinois, and the Court cannot say that British Columbia had a more significant relationship to the occurrence and parties . . . . **Thus Illinois law will apply** . . . .") (emphasis added) (citations and internal quotation marks omitted).) The Court finds no reason to revisit that conclusion now.

Briefly, under Illinois law, choice-of-law provisions such as that found in the EULA are generally upheld, but the Court still must conduct a two-part analysis to determine "the breadth of a contractual choice-of-law provision." *Birnberg v. Milk St. Residential Assoc. Ltd. P'ship.*, Nos. 02 C 0978, 02 C 3436, 2003 WL 151929, at *13 (N.D. Ill. Jan. 21, 2003). The first part of the analysis "examine[s] the language of the contract's choice-of-law clause to determine if the parties 'intended [it] to govern all claims between them.'" *Id.* (quoting *Medline Indus. Inc. v. Maersk Med., Ltd.*, 230 F. Supp. 2d 857, 863 (N.D. Ill. Nov. 14, 2002)). Here, for reasons previously explained in the Court's *forum non conveniens* opinion, the plain language of the

EULA's choice-of-law provision limits its application to the interpretation of the agreement itself (as opposed to covering all claims "arising out of" or "relating to" the agreement), and so the Court finds no intent for British Columbia law to apply to all claims relating to the Software.[3]

Next, the Court considers whether the tort claims Beaton asserts nonetheless depend on the EULA, such that they should be subject to the agreement's choice of law "regardless of the breadth of the clause." *Medline Indus. Inc.*, 230 F. Supp. 2d at 862. On this point, the Court previously concluded that the ICFA claims are not sufficiently related to the EULA for the choice-of-law provision to govern them. (*See* June 5, 2015 Mem. Op. and Order at 10.) And SpeedyPC offers no new reason to disturb that conclusion at this stage in the proceedings.

Finally, having confirmed that the choice-of-law provision in the EULA does not preclude the ICFA claims, the Court still must consider whether general Illinois choice-of-law principles requires application of Canadian law to the fraud-based tort claims. Again, the Court stands on its prior analysis in the *forum non conveniens* opinion, which concluded that "the law of the state where the injury occurred applies unless another state has a more significant relationship to the occurrence and parties," *Wilcox v. Incandela*, No. 91 C 5730, 1992 WL 137165, at *4 (N.D. Ill. June 1, 1992); and here, the forum state of Illinois has a more significant relationship to the occurrence than British Columbia. (*See* June 5, 2015 Mem. Op. and Order at 11.)

In sum, the Court stands by its earlier analysis and finds that the choice of British Columbia and Canadian law in the EULA does not preclude Beaton's and the Subclass's ICFA claims.

---

[3] The EULA provides that "[t]his Agreement shall be governed exclusively by the laws of the Province of British Columbia and the laws of Canada applicable therein." (PRDSF ¶ 14.)

### B. Extraterritoral Effect of the ICFA

SpeedyPC also contends that, even aside from the EULA's choice-of-law provision, the ICFA still does not apply to the purchases of the Software by Beaton and the other Subclass members because the statute has no extraterritorial effect and the allegedly fraudulent transactions did not occur "primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 854 (Ill. 2005) ("[A] plaintiff may pursue a private cause of action under the [ICFA] if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois.").

Indeed, the Illinois Supreme Court has "severely limited the extraterritorial reach of the ICFA." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009) (citing *Avery*, 835 N.E.2d 801). To determine whether disputed transactions occurred primarily and substantially in Illinois, such as to fall within the reach of the ICFA, the Court considers various factors, including:

> (1) the claimant's residence; (2) the defendant's place of business; (3) the location of the relevant item that is the subject of the disputed transaction; (4) the location of the claimant's contacts with the defendant; (5) where the contracts at issue were executed; (6) the contract's choice of law provisions, if there are any; (7) where the allegedly deceptive statements were made; (8) where payments for services were to be sent; and (9) where complaints about the goods or services were to be directed.

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 312 F. Supp. 3d 725, 733 (N.D. Ill. 2018). Here, that Beaton and the Subclass members reside in Illinois, the advertisements at issue were viewed in Illinois, the Software purchases were made from Illinois, and Beaton and the Subclass members entered into contracts with SpeedyPC from Illinois, all point to the disputed transactions falling within the ambit of the ICFA. Though SpeedyPC's place of business is British Columbia and the allegedly deceptive statements were likely made from there, on balance, the factors weigh in favor

of Illinois being where the relevant transactions primarily and substantially occurred. Accordingly, the Court concludes that the transactions fall within the reach of the ICFA.

For these reasons, Beaton's and the subclass's ICFA claims survive summary judgment.

## CONCLUSION

For the reasons stated above, SpeedyPC's motion for summary judgment (Dkt. No. 333) is granted in part and denied in part. The motion is granted as to the claims asserted by Beaton and the Class members for breaches of the implied warranties under the SGA, but the motion is denied as to the claims asserted by Beaton and the Subclass members under the ICFA.

ENTERED:

Dated: March 30, 2023

_____
Andrea R. Wood
United States District Judge